**Tommie J. SMITH, Petitioner,**

v.

**Robert FARLEY, Superintendent Indiana State Prison, Respondent.**

**No. 88cv685.**

United States District Court,
N.D. Indiana,
South Bend Division.

Oct. 31, 1994.

Michael P. Rehak, South Bend, IN, F. Thomas Schornhorst, Bloomington, IN, for petitioner.

David A. Arthur, Indianapolis, IN, for respondent.

### MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

## I. INTRODUCTION

On November 25, 1988, the petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The petitioner and a co-defendant, Gregory Resnover (hereinafter Resnover) were convicted of murder and conspiracy to commit murder in the shooting death of Indianapolis policeman Jack Ohr-

berg ("Ohrberg").[1] The petitioner was sentenced to death and is on death row at the Indiana State Prison in Michigan City, Indiana. Most recently, once again, oral argument and a hearing was held in Lafayette, Indiana on the 14th of October, 1994.

## A. Historical Perspectives

In order to keep the nature of habeas corpus in the United States courts in proper perspective, it is helpful to briefly trace its origins. To be sure, the so-called Great Writ evolved on both sides of the Atlantic in the 17th and 18th centuries. In 1679, a Restoration Parliament forced a Habeas Corpus Act onto a very reluctant and hostile King Charles II as a means of testing royal authority. That writ remained an essential feature of the Glorious Revolution and the English Bill of Rights a decade later. This writ also found favor with the American colonies as witnessed by the enactment of a Habeas Corpus Statute in 1692 in Massachusetts. It was also honored in a number of colonial charters and state constitutions which predated the Federal Convention in 1787. For example, the New Jersey Constitution of 1776 and the Georgia Constitution of 1777 contained specific provisions for a writ of habeas corpus.

In Article I of the Constitution of the United States, which defined congressional authority, the writ of habeas corpus was presumed to exist and an attempt was made to place limitations on congressional authority to suspend it. The ratifying conventions which considered the Constitution of the United States made many recommendations as the content of a Bill of Rights for it. A number of these suggested including a specific amendment guaranteeing the right to a writ of habeas corpus. The First Congress under the leadership of then Representative James Madison considered many of these habeas recommendations along with the contents of the "Declaration of Rights" in the various state constitutions, as well as the preceding English and colonial history, in formulating the contents of a Bill of Rights. A specific habeas amendment was not included in the amendments which were submitted to the states in 1789, ratified as of December 15, 1791, and now constituting the first 10 amendments plus the recently ratified 27th amendment.

Thus, one must look to Congressional enactments rather than to the facial fabric of the Constitution itself to understand the full dimensions of current usage in regard to federal habeas corpus. The first federal statute to deal with habeas corpus was the Judiciary Act of 1789, Ch. 20, S. 14, 1 Stat. 81, but it was limited to petitioners held in federal custody. The American Civil War put the provisions regarding habeas corpus in Article I of the Constitution to its greatest challenge. Immediately following that event, the Congress enacted the first truly elaborate federal Habeas Corpus Act in 1867, Ch. 28, S. 1, 14 Stat. 385, which, for the first time, permitted United States courts to hear habeas petitions from persons held in state custody. Interestingly, in an era when virtually all federal statutes used the masculine gender alone, the 1867 Habeas Corpus Act specifically used both the male and female gender in describing persons who were entitled to its benefits. The writ was available "in all cases where any person may be restricted of his or her liberty in violation of the Constitution, or of any treaty or law of the United States." In the 127 years since 1867, the United States courts have witnessed a massive growth in state prisoners seeking relief in United States courts, now under 28 U.S.C. § 2241 et seq., the present day progeny of the 1867 Act. It remains of high moment to note that this proceeding is made possible by reason of a specific Congressional enactment. Congress certainly has the authority to condition the entertainment in United States courts of petitions by state prisoners and has done so particularly in 28 U.S.C. § 2254(d). The basic legislative purpose of § 2254(d) is to avoid the complete retrial of factual issues in United States dis-

---

1. Resnover's conviction and sentence were upheld by the Indiana Supreme Court in *Resnover v. State*, 460 N.E.2d 922 (Ind.1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160 (1984). Resnover also pursued a petition for post-conviction relief, which was denied, and the Indiana Supreme Court again has denied the appeal. *Resnover v. State*, 507 N.E.2d 1382 (Ind. 1987); *Resnover v. State*, 547 N.E.2d 814 (Ind. 1989).

trict courts hearing state prisoner habeas petitions, especially where the highest court in a state has specifically delineated the relevant facts. This basic view accorded § 2254(d) is reflected in key decisions of the Supreme Court of the United States and also represents a decent respect for federalism. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

A United States court may have a problem when the highest state court or any other relevant state court has not properly delineated the determinative facts. *See, Johnson v. Trigg,* 28 F.3d 639 (7th Cir.1994). In this case, the highest court in Indiana without dissent has clearly and completely delineated the relevant facts, and the invitation to wade into a retrial thereof will be most respectfully declined. In this context, the Supreme Court of the United States has set forth the standards by which a United States district court must examine the state factual record for sufficiency of evidence.

Justice Stewart, speaking for the Supreme Court of the United States in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), stated:

A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state post-conviction remedies to redress possible error. See 28 U.S.C. § 2254(b), (d). What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitu-

tional right—is not one that can be so lightly abjured.

*Id.* at 323, 99 S.Ct. at 2791. The Supreme Court in *Jackson* held:

We hold that in a challenge to a conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof beyond a reasonable doubt.

*Id.* (footnote omitted). *See also Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Dooley v. Duckworth,* 832 F.2d 445 (7th Cir.1987), *cert. denied,* 485 U.S. 967, 108 S.Ct. 1239, 99 L.Ed.2d 438 (1988); *United States ex rel. Haywood v. O'Leary,* 827 F.2d 52 (7th Cir.1987); *Bryan v. Warden, Indiana State Reformatory,* 820 F.2d 217 (7th Cir.1987), *cert. denied,* 484 U.S. 867, 108 S.Ct. 190, 98 L.Ed.2d 142 (1987); *Shepard v. Lane,* 818 F.2d 615 (7th Cir.), *cert. denied,* 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987); and *Perri v. Director, Department of Corrections,* 817 F.2d 448 (7th Cir.), *cert. denied,* 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987).

Here, the focus must be on any claimed violation of the Constitution, treaties or statutes of the United States. *See Bell v. Duckworth,* 861 F.2d 169 (7th Cir.1988), *cert. den.,* 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989). Under *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), the entire state court record has been independently examined by this court. *See also, Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The conviction of this petitioner and the imposition of the death sentence has now been before the Supreme Court of Indiana on three separate occasions, and that court, thus far, without dissent, has affirmed both the conviction and the sentence against the various challenges that are well reflected in reported decisions. In recent times, the Supreme Court of Indiana has been most willing to exercise a high level of judicial review of death penalty cases and has been equally willing to enter reversals or remands of such convictions.

*Burris v. State,* 558 N.E.2d 1067 (Ind.1990) and cases there collected; *See also, Kennedy v. State,* 620 N.E.2d 17 (Ind.1993); *James v. State,* 613 N.E.2d 15 (Ind.1993); *Bellmore v. State,* 602 N.E.2d 111 (Ind.1992); *Evans v. State,* 598 N.E.2d 516 (Ind.1992); *Castor v. State,* 587 N.E.2d 1281 (Ind.1992); *Landress v. State,* 600 N.E.2d 938 (Ind.1992) (*aff'd on remand,* 638 N.E.2d 787 (Ind.1994)). Most recently, that high court has granted yet another state review proceeding in a death penalty case that had been the subject to full federal review. *Schiro v. Clark,* 754 F.Supp. 646 (N.D.Ind.1990), *aff'd,* 963 F.2d 962 (7th Cir.1992), *cert. granted,* —— U.S. ——, 113 S.Ct. 2330, 124 L.Ed.2d 243 (1993), *aff'd,* —— U.S. ——, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994). Even after *Schiro* returned to the Supreme Court of Indiana from the Supreme Court of the United States, an order was entered granting yet another review apparently on the basis of state law. *See Shiro v. State,* No. 07500–9403–SD–273, (Ind. April 15, 1994). So, there is no disposition whatsoever by the highest court of Indiana to rush to judgment in death penalty cases. Far from it. In addition to the actions by the Supreme Court of Indiana involved in the present case, the Supreme Court of the United States has already once denied certiorari. Even given this extensive and time consuming review by the Indiana judiciary, it is not for this court to simply rubber stamp this state death penalty conviction. The demands of *Miller v. Fenton,* must be taken most seriously, and, here, they are.

In another regard, Congress has conditioned the entertainment of state prisoner petitions by United States District Courts. Available state remedies must be exhausted. *See* 28 U.S.C. § 2254(c); *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Duckworth v. Serrano,* 454 U.S. 1, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981). The adversarial machinations of § 2254 petitioners where the death penalty has been imposed are different than in other state prisoner petitions brought under that statute. In most non-death penalty cases, the petitioner avoids as many state review procedures as possible to get quick and early federal review. Such is not the case when the death penalty is involved. The adversarial dynam-ics are just the opposite. In death penalty cases, the convicted petitioner wants all and as much of repeated state review as possible. That precise reality has caused the Supreme Court of the United States to recently take a very hard line on such repeated reviews in death penalty cases. *Gomez v. US Dist. Ct N.D. Cal.,* 503 U.S. 653, 112 S.Ct. 1652, 118 L.Ed.2d 293 (1992); *See, e.g., Arave v. Creech,* —— U.S. ——, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993); *Johnson v. Texas,* —— U.S. ——, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993); and *Butler v. McKellar,* 494 U.S. 407, 411, 110 S.Ct. 1212, 1215, 108 L.Ed.2d 347 (1990); *But see, Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

One of the adversarial devices used in death penalty cases to extend the time and effort in the state courts is to raise new issues in later proceedings that could have been raised earlier or to raise issues that have already been decided. From those ashes has arisen the judicial phoenix now called procedural default, a most difficult concept which has ebbed and flowed since its conception with a particularly unique history in federal habeas death penalty cases. *See, Coleman v. Thompson,* 504 U.S. 188, 112 S.Ct. 1845, 119 L.Ed.2d 1 (1992). The larger purpose of these Congressional enactments and Supreme Court decisions is to try to find a means toward judicial finality in cases which require great care and sensitivity to constitutional values under Amendment VIII. There are those who, being witness to these lengthy and convoluted proceedings and having become weary of the same, have proclaimed that the public policy of imposing the death penalty in any case should be completely abandoned. *See, Callins v. Collins,* —— U.S. ——, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994); *See also, Powell Recants Death Penalty View,* The National Law Journal, A12 (June 13, 1994). Proclaiming on the wisdom of the death penalty in general and public policy questions involving it is not a luxury available to this court. Its duty and burden here is to deal with the hard realities of this unusual species of litigation under prevailing law as fairly and as promptly as possible.

## B. Procedural History

This court alluded to the procedural history of this case above, however, a more precise history is now necessary. The petitioner's conviction and sentence were affirmed in his direct appeal to the Indiana Supreme Court. There were *no* dissenting or concurring opinions. *See Smith v. State,* 465 N.E.2d 1105 (Ind.1984) (hereinafter *"Smith I"*). In addition, the petitioner filed for state post-conviction relief. After a hearing was held, the state trial judge issued extensive findings of fact and conclusions of law and denied the petition. The petitioner appealed the denial of the post-conviction petition, and again the conviction and sentence were affirmed by the Indiana Supreme Court. *See Smith v. State,* 516 N.E.2d 1055 (Ind.1987), *cert. denied,* 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 347 (1988) (hereinafter *"Smith II"*). Finally, the petitioner filed for post-conviction relief a second time. The petition was once again denied and once again the denial was affirmed by the Indiana Supreme Court. *See Smith v. State,* 613 N.E.2d 412 (Ind.1993) (hereinafter *"Smith III"*).

In this court Mr. Smith has the following pending: 1) his original November 25, 1988 petition for Writ of Habeas Corpus, 2) a June 28, 1994 Motion to Substitute Party–Names Respondent, 3) a June 28, 1994 Motion to Amend Petition for Writ of Habeas Corpus, 4) a July 4, 1994 Motion for Evidentiary Hearing, and 5) a September 30, 1994 Motion for Supplemental Order with Respect to Transmittal of State Court Records. To clarify the record, this court now rules on some of the above motions. This court hereby GRANTS the petitioner's June 28, 1994 Motion to Substitute Party–Names Respondent and ORDERS that the current superintendent Robert A. Farley, be substituted for former superintendent Richard Clark. This court hereby DENIES petitioner's September 30, 1994 Motion for Supplemental Order with Respect to Transmittal of State Court Records as the Indiana Attorney General has already supplied the materials requested.

On February 21, 1989 petitioner's able and experienced counsel submitted an elaborate 104 page brief in support of Mr. Smith's Petition for Writ of Habeas Corpus (hereinafter *"Traverse Memorandum"*). That brief was supplemented by a thirty-five page brief submitted on May 15, 1989. On July 1, 1994 petitioner submitted a twenty-nine page brief in support of his Amended Petition for Writ of Habeas Corpus. Finally, on October 14, 1994 a twenty-eight page brief in support of petitioner's Amended Petition and Motion for Evidentiary Hearing was filed. Also filed on that date was a 169 page Amended Appendix to the Amended Petition for Writ of Habeas Corpus. Having carefully considered the briefs and read the cases cited, as indicated below, this court denies petitioner's Motion to Amend Petition for Writ of Habeas Corpus.

## C. Factual History

The evidence and testimony from the criminal trial as outlined by the Indiana Supreme Court begins on December 11, 1980 at 3:00 a.m. when Indianapolis Police Sergeant Jack Ohrberg and another officer were serving an arrest warrant "on individuals believed to be at 3544 North Oxford Street in Indianapolis." *Smith II* at 1058. The Indiana Supreme Court continues:

Ohrberg and [the other officer] Christ were joined by four officers before arriving at the duplex at approximately 5:30 a.m. With Officers Schnieder and Harvey standing watch in the rear, Ohrberg, Christ, and Officers Ferguson and Foreman proceeded to the porch and front door. Ohrberg knocked loudly several times and identified himself as a police officer. Receiving no response, Ohrberg and Ferguson went to the adjacent half of the duplex, and learned from the tenant that she had heard movement in the adjoining half earlier in the night.

Ohrberg returned and again pounded on the front door, announcing himself as a police officer. When no response or movement was heard from within, Ohrberg assumed a crouched position and started to use his right shoulder to batter the door which, after a few hits, began to open. Ohrberg continued to hit the door. His body was partially inside the residence. Foreman and Christ saw furniture blocking the door. Foreman saw a burst of

muzzle flash from inside and heard two or three shots in quick succession, then a pause for two seconds and then another rapid burst of fire. The simultaneous muzzle blasts came from two separate locations approximately eight to ten feet apart. Christ also heard the shots from inside the residence. Ferguson's testimony paralleled that of Foreman and Christ.

Ohrberg fired his gun into the house. Ohrberg then stepped back and to the left (south) on the porch, telling the other officers he had been shot. Ohrberg sank to his knees and collapsed on the porch. He lay at an angle to the doorway, head toward the house and feet toward the street. Foreman recalled Ohrberg had fallen forward and the majority of his body was at a 45 degree angle to the house or the street, with his head up very close to the window and his body extending outward, his feet out by the front end of the porch. At the post-conviction hearing Christ said Ohrberg fell to the south of the doorway with his head to the southwest on his stomach or his left side. His head was under the window to the south of the doorway.

Christ was standing to the right (north) of Ohrberg when Ohrberg was shot. As Ohrberg fell, Christ left the porch and retreated to the north. Taking cover, Christ saw a person with an "Afro" and a rifle emerge from the doorway onto the porch and fire at least two additional shots toward Ohrberg. Shots were also being fired from within the residence. Christ fired two shots at the figure in the doorway, and the man retreated inside. Ferguson was to Ohrberg's left (south) when Ohrberg was shot. Ferguson retreated to the south edge of the porch. He also saw the person in the doorway, holding a rifle in a "hip position" while standing over Ohrberg and fire his rifle right and left. He did not observe shots striking Ohrberg. Ferguson testified he could see the muzzle flash as the rifle was fired. Ferguson fired at the gunman and then ran around the corner of the house where gunfire continued to be directed at him.

Soon Gregory Resnover called to Christ that he wanted to talk and that Smith had been wounded. Negotiations proceeded, and after a few minutes, Gregory and Earl Resnover tossed weapons onto the porch and surrendered. Earl Resnover's billfold contained Ohrberg's business card. Smith was found on the living room floor. Next to Smith was a rifle and a damaged ammunition clip with a bullet hole piercing the clip from front to back. Ohrberg died of three gunshot wounds. Fragments of one bullet recovered at autopsy showed it was fired from the rifle found next to Smith.

A neighbor in the adjoining duplex said that before the shooting started she heard someone shout that it was the police and heard noise which may have been the chair being moved to barricade the door. This Court found that the facts adduced at trial show that the men inside 3544 North Oxford knew that the men at their door were police officers when they commenced firing on them. Further, Earl and Gregory Resnover had previously met Ohrberg who told them that his police investigation would likely involve them. Ohrberg's superior testified that Ohrberg was acting in the course of his duty as a police officer.

*Id.* at 1058–59. These facts are presumed correct under 28 U.S.C. 2254(d).

In seeking a writ of habeas corpus under 28 U.S.C. § 2254, the petitioner makes several challenges to his conviction and sentence. This court will evaluate those challenges seriatim.

## II. DISCUSSION

### A. Sixth Amendment Confrontation Rights

The petitioner contends that his Sixth Amendment Confrontation rights as enunciated in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), were contravened through three references to statements made by codefendant Resnover. At trial the State introduced three statements of the petitioner's codefendant Resnover that were made after Resnover was taken into custody. Resnover did not testify during his joint trial with the petitioner; therefore, there was no opportunity to cross-examine Resnover about the state-

ments. The state trial court denied the petitioner's motion for severance of trials on this basis, however, the state trial court granted the petitioner's motion in limine prohibiting direct references to the petitioner in any of the three statements.

In the order presented at trial, the statements at issue are as follows:

The *first statement:* "Beautiful shot! Blowed him away!" followed by "laughing and cutting up," which was overheard by the driver of the police van while Resnover, his brother ·Earl and two women were being taken to jail. The petitioner was transported separately to a hospital for treatment of his wound. *See Memorandum of ·Points and Authorities in Support of Petition for Writ of Habeas Corpus and in Opposition to Respondent's Return to Order to Show Cause ("Traverse Memorandum")* (filed March 8, 1989).

The *second statement* was related by jail-house informant Gregory Johnson who, on the morning of the shootings, was recruited personally by Prosecutor Goldsmith and investigating police officers to monitor the Resnover statements in holding cell in the courthouse. After agreeing to cooperate with the state, Johnson was placed in the holding cell with the Resnovers sometime before noon on December 12, 1980. According to Johnson, Resnover explained how he had been awakened early that morning by a knock on the door and had gone to the front of the house; he knew the police were there; he then went back to the rear of the house and knocked on the door of a bedroom occupied by Earl Resnover and Theresa Nance; he told Earl the police were outside and then went to get his rifle which was located in another bedroom; he started toward the front of the house and noticed that Earl's door was not open; he kicked in the door and then "went on to the front room and took a squatting position and no sooner the door was kicked in. He fired some rounds at the person coming through the door." *Id.*

The *third statement* was related at trial by a newspaper reporter, Scott Miley, who had a conversation with Gregory Resnover at the Marion County Jail on April 27, 1981. Prior to his testimony, Miley was advised by the

trial judge that an order *in limine* had been entered and that Miley was to make no mention of Smith as he testified about Resnover's statements. *Id.* On the State's direct examination Miley said that Resnover told him thaṫ he was awakened by gunfire as he lay in a bedroom of the house with his girlfriend. The State's examination continued:

Q: What did he say he did next?

A: He walked out into the hallway, went down the hallway slowly, and saw Tommie Smith leaning against the kitchen wall, and he was wounded, he was bleeding.

Q: What did he say then?

A: He picked up a gun and fired shots toward the front of the house.

Q: Did he tell you where the gun was located?

A: No.

Q: What did he say then?

A: He looked out the window, saw some police cars pulling up, realized it was the police, and went back to the back of the house.

Q: And what did he say he did then?

A: He said he saw Tommie Smith crawling out into the front room and he went to the back to get his brother Earl.

*Id.* During cross examination by Resnover's counsel further references to the petitioner were included:

Q: [Mr Alsip] ... I would direct your attention to the conversation with my client, Gregory Resnover, and his rendition of the facts of the incident that morning Sergeant Ohrberg was killed. You said that he came into the, I think the front part of the house or the kitchen area, and observed that Tommie Smith was wounded. Is that what you told me?

A: Yes.

Q: And at that time you just told this jury that he picked up a weapon and fired it out the front of the house. Did he also in that conversation indicate to you why he fired the weapon?

Was it in response to something that Tommie Smith said? At that instant, that morning in the house?

A: Yes.

Q: And what was that?

A: He, Gregory stated that when he came out there, Tommie said.

*Id.* At this point, petitioner's counsel objected invoking the trial court's order *in limine* and the judge indicated a willingness to sustain. Resnover's lawyer then explained that he was trying to extract from Miley the reason why Resnover fired: "my question to him was, what precipitated, did Gregory Resnover also say to you that something that Smith said or did precipitated him firing the weapon." The witness here responded "Yes." before the court ruled on the objection. Petitioner's counsel withdrew his objection. The question proceeded:

Q: What was it the Tommie Smith said or did that Resnover said precipitated the weapon fired?

A: He said, They're on the porch, get 'em off the porch.

Q: Just those words?

A: Yes.

Q: And at that point Resnover fired the weapon?

A: Yes, he grabbed his gun and fired.

*Id.*

The State also questioned Miley about an interview with the petitioner in the county jail on May 20, 1981, in which the petitioner gave his version of the events on the morning of the shooting:

[Miley]: [Smith] stated that he had been asleep when suddenly the front door was forced open, that the door did not open all the way, it had jammed, and that he picked up a rifle and fired shots.

\* \* \* \* \* \*

He then went to the door, thinking that whoever the person was had left, stepped out onto the porch, did not see anyone on the porch and started to turn to come back in when he was shot.

*Id.*

In *Bruton*, the Supreme Court, evaluated whether a defendant's Sixth Amendment Confrontation rights were violated though the prosecution's introduction of a co-defendant's incriminating confession at their joint trial, even if the jury is instructed to consider that confession only against the co-defendant. The Court, speaking through Justice Brennan, explained:

there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.... Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands side-by-side with the defendant, are deliberately spread before the jury in a joint trial.

*Id.* at 135–136, 88 S.Ct. at 1627–1628 (citations omitted).

The statements at issue do not facially violate the dictates of *Bruton*. The statements do not expressly implicate the petitioner in the charged crime and thus the statements are not "powerfully incriminating." *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987); *See also, Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). "In other words, [here] the admission of a codefendant's statement is not error under *Bruton* [because] the statement 'was not incriminating on its face, and became so only when linked with evidence introduced later at trial'." *United States v. Arias*, 984 F.2d 1139 (11th Cir.1993) quoting *Richardson, supra.* Here, the statements are not a violation of *Bruton* unless such statements "could be fairly understood to incriminate the accused." *United States v. Campbell*, 935 F.2d 39 (4th Cir.1991). "*Bruton* is not violated unless the co-defendant's statement *directly* alludes to the [defendant], even if the evidence 'makes it apparent that the defendant was implicated by some *indirect* references.'" *United States v. Restrepo*, 994 F.2d 173 (5th Cir.

1993). These statements, standing alone, do not expressly implicate this petitioner in this crime. Indeed, the first and the second statements do not refer specifically to the petitioner. This is not enough to constitute a violation of *Bruton*.[2] (*See also, U.S. v. Holleman,* 575 F.2d 139 (7th Cir.1978); *cf. U.S. v. Cook,* 530 F.2d 145 (7th Cir.1976), *cert. denied,* 426 U.S. 909, 96 S.Ct. 2234, 48 L.Ed.2d 835 (1976).

On this issue, the Indiana Supreme Court in *Smith II,* indicated that these statements did not implicate *Bruton:*

First, Resnover's "Beautiful shot" remark does not refer to Smith. It may have been meant to be self-congratulatory, and refutes the claim that shooting the officer was a tragic error resulting from not understanding that the persons entering the house were police officers. Second, the jailhouse informant made no mention of Smith. He described only what Resnover said he did, and that Resnover told him he knew it was the police at the door. Third, reporter Miley did mention Smith. However, he merely quoted Resnover in establishing that Smith was present in the front room and was wounded and that Smith asked Resnover to get the police off the porch. Miley's testimony does not show that Smith knew the men on the porch were police officers before the shooting started. The content of the statements do not facially incriminate Smith and thus, do not violate *Bruton.*

Further, reporter Miley's references to Smith do not violate *Bruton* because Smith made similar statements to Miley. Resnover told Miley he was awakened by gunfire, went down the hallway and saw Smith leaning against the kitchen wall. Smith was wounded. Resnover picked up a gun and fired some shots toward the front of the house. He saw some police cars pulling up and went to the back of the house. During cross-examination, Miley testified Resnover said he fired in response to something Smith said. Smith, in a separate interview, admitted to Miley that he

fired shots at a figure attempting to enter the front door of the duplex. Since Smith's own properly admitted statement confessed to firing at a figure entering the front door, there was no harmful result in the admission of the Resnover statement. Further, on Smith's direct appeal this Court observed the record shows that the witnesses' testimony was directed toward Gregory Resnover only and did not involve Smith in any manner. *Smith,* 465 N.E.2d at 1121.

*Id.* at 1060–61. This court agrees with the Indiana Supreme Court and notes that the Supreme Court of the United States has admonished that *Bruton* has limits. "The Confrontation Clause has never been held to bar the admission into evidence of every relevant extrajudicial statement made by a nontestifying declarant simply because it in some way incriminates the defendant." *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979).

This court also notes that this issue may also be decided under *United States v. Hamilton,* 19 F.3d 350 (7th Cir.1994). The very erudite opinion by Judge Ripple evaluated the *Bruton* situation, the Sixth Amendment confrontation clause, and Rule 804(b)(3) of the Federal Rules of Evidence. If the statements attributed to Resnover satisfy the statement against penal interest requirements of Rule 804(b)(3), then the right of cross-examination under the Confrontation Clause is protected because of the equivalent guarantees of trustworthiness. *Id.* at 357. This court need not determine this matter insofar as this court finds no constitutional error under *Bruton.*

The trial court granted the petitioner's motion *in limine* "prohibiting direct reference to [the petitioner] in the three statements." *Smith II,* 516 N.E.2d at 1060–61. "The statements were admitted against Resnover only." *Id.* Of the three above mentioned statements, the petitioner *only* objected to the last statement. No objection was

---

**2.** This court notes that *Bruton* error may fall under the aegis of harmless error. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). For the most recent formulation of that concept see *Brecht v. Abrahamson,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

made to the first or the second.[3] It is important to note that *"[n]o jury instructions limiting the use of the evidence to Resnover were requested." Id.* The Indiana Supreme Court also addressed the petitioner's contention that "it was fundamental error at trial for the court not to admonish the jury nor give the jury an instruction limiting the applicability of the statements to Resnover." *Id.* The Indiana Supreme Court[4] further explained:

> This contention is not presented in the post-conviction petition. Smith's petition claimed only that the statements, due to their content, were objectionable. Issues not presented in the post-conviction petition are waived.

*Id.* (citations omitted). This specific reference by the Indiana Supreme Court on the issue of instructing by the court *sua sponte* is barred by procedural default. *See, Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The factual setting and reasoning of *U.S. v. Hamilton,* 19 F.3d 350 (7th Cir.1994) in relevant here. There Judge Ripple stated:

> Mr. Miller next asserts a Sixth Amendment Confrontation Clause violation. He claims that the district court erred by admitting the extrajudicial statements of his codefendant, Mr. Hamilton, against him at trial. He asserts as an absolute proposition that "where two defendants are tried jointly, the pre-trial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." appellant Miller's Br. at 6. He submits that the district court erred including that incriminating statements made by Mr. Hamilton were admissible against him under Federal Rules of Evidence 804(b)(3),

which excepts statements made against the declarant's interest from the general prohibition against hearsay. As a result, Mr. Miller asserts, the admission of Mr. Hamilton's extrajudicial statements in his trial violated his right of cross-examination under the Confrontation Clause as set forth in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In response, the government argues that Mr. Miller's *Bruton* contention is misplaced. In its view, the district court was correct in deeming Mr. Hamilton's extrajudicial statements to be admissible against Mr. Miller under Rule 804(b)(3). *Bruton,* the government states, dealt only with a confession used at a joint trial against the declarant-codefendant that was not admissible against the nondeclarant-codefendant under any hearsay exception.

> Mr. Miller's argument displays a misperception, albeit a common one, of the Supreme Court's holding in *Bruton. Bruton* concerned a declarant-codefendant's confession that was admitted only against the declarant at the joint trial of the declarant and his codefendant Bruton. *Id.* at 124–25, 88 S.Ct. at 1621. In *Bruton,* the government did not attempt to use the confession against Bruton because, under the prevailing rules of evidence, it was inadmissible hearsay. Indeed, the trial court gave an appropriate limiting instruction that the statement not be used against Bruton. Nevertheless, the Supreme Court held that, "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt," Bruton's confrontation rights were violated. *Id.* at 126, 88 S.Ct. at 1622–

---

3. In *United States v. Chrismon,* 965 F.2d 1465 (7th Cir.1992), the Seventh Circuit on direct appeal of a criminal conviction indicated that "because [defense counsel] failed to object to [an alleged *Bruton*] statement at trial, we review only for plain error." *Id.* The test for plain error is an error "that resulted in an actual miscarriage of justice, which implies the conviction of one who but for the error would have been acquitted." *Id.* (citations omitted)

4. In addition, on the issue of severance of the two defendants, the Indiana Supreme Court explained:

> Smith claims the trial judge was obliged, sua sponte, to order a severance of defendants once the nature of Resnover's statements became manifest. As this Court noted in Smith's direct appeal, since the statements did not unduly prejudice Smith, severance of the causes was not necessary.... It was proper for Smith to be tried jointly with Gregory Resnover and further to have presented to the same jury in the same trial both the charges of murder and conspiracy to commit murder....

*Id.*

23. However, the Court expressly reserved the question whether such a violation occurs when the extrajudicial statements are admissible against the declarant's codefendant under an exception to the hearsay rule:

> We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence.... There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause.

*Id.* at 128 n. 3, 88 S.Ct. at 1623–24 n. 3. In short, *Bruton* does not address the issue before us in this case. Previous cases in this circuit, however, have, and those cases present the rule of decision that must govern the case before us today.

In *United States v. York*, 933 F.2d 1343 (7th Cir.), *cert. denied*, [502] U.S. [916], 112 S.Ct. 321, 116 L.Ed.2d 262 (1991), we addressed a *Bruton* claim similar, though not identical, to the one Miller presents. In *York*, the defendant contested the district court's admission of incriminating extrajudicial statements made by York's partner, Mahar. Mahar had told two acquaintances that Mahar and York were planning to burn down a business for insurance proceeds. Mahar was unavailable at York's trial because she had died in the very blaze for which York was on trial. We held that admitting the testimony against York was not precluded by *Bruton*. Unlike the declarant's statement in *Bruton*, Mahar's statement was admissible against York under a hearsay exception, Rule 804(b)(3). *Id.* at 1362–64. We held that the statement made against the penal interest of Mahar was sufficiently reliable to justify its use against York. In reaching that decision, however, we cast the governing rule cautiously:

> So long as the incriminating and inculpatory portions of a statement are closely related, if the circumstances surrounding the portion of a declarant's statement inculpating another are such that

the court determines that the inculpatory portion of the statement is just as trustworthy as the portion of the statement directly incriminating the declarant, there is no need to excise or sever the inculpatory portion of the statement. Mahar's inculpatory statements were admissible under Rule 804(b)(3) and therefore there was no confrontation clause violation. *Id.* at 1364. In *United States v. Curry*, 977 F.2d 1042 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993), we acknowledged with approval the holding in *York*. In *Curry*, the district court allowed the government to present an informant's testimony concerning incriminating statements codefendant Bush had made. *Id.* at 1055. Because the testimony was admissible under Rule 804(b)(3), we held that *Bruton* did not preclude the admission of the evidence at the joint trial because *Bruton* dealt with inculpatory statements that were inadmissible against the nondeclarant-codefendant. As Mr. Miller correctly points out, the district court in *Curry* gave a limiting instruction stating that Bush's extrajudicial statements would be admissible only against Bush. *See id.* However, we do not read the decision as turning on this point. Once it ruled that the testimony was excepted from the general prohibition against hearsay by virtue of Rule 804(b)(3), the district court in *Curry* need not have given such a limiting instruction. Rather, it appears that the government should have been able to use the declarant-codefendant's extrajudicial statements against the nondeclarant-codefendant.

*Id.* at 354–56. Finally, these Resnover statements do not run afoul of the teaching of *Williamson v. U.S.*, —— U.S. ——, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).

## B. Prosecutorial Misconduct

Next, the petitioner asserts that the prosecutor engaged in prejudicial misconduct at numerous junctures in the guilt phase of the trial. Specifically, the petitioner asserts that "[t]he prosecutors included in their closing remarks to white jurors references prem-

ised upon racial images and stereotypes." *Traverse Memorandum,* at 46. Here, the petitioner offers the following excerpt:

> Now, what about Tommie. Tommie signed his name for us and we owe him a debt of gratitude. Because Tommie couldn't be satisfied with tearing Jack's guts apart [with] that first shot. Oh, no. He's got to play *super-fly* and come out here and blow holes in a man who is lying dying on the sidewalk.

*Id.* And the following excerpt is outlined by the petitioner:

> "Theresa Nance came in here. She did a little *shucking and jiving* on the stand...." *Id.*

(emphasis supplied by petitioner). In addition, the prosecutor referred to the defendants as "boys."

The petitioner argues that "[e]xecrable racial epithets are encoded beneath the veneer" of the prosecutor's comments. *Id.* The petitioner argues that "[a]ppeals to racial prejudice 'are foul blows and the courts of this country reject them.'" *Id.* citing *Withers v. United States,* 602 F.2d 124, 127 (6th Cir. 1979). *See also, Berger v. U.S.,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

The Indiana Attorney General argues that many of the words and phrases utilized by the prosecutor in his closing argument are innocuous. Here, the reference to superfly and shucking and jiving are not dispelled as innocuous. She asserts that shucking and jiving was presented to convey the demeanor of the witness as misleading and evasive. She also argues that superfly as an allusion as it was used here is meant to be part of persuasive speech much like references appear from the Classics, the Bible, or Shakespeare. Or modern day similes and metaphors such as describing a soldier with a "Rambo" mentality, or describing a police officer as "Barney Fife" or "Dirty Harry."

■ "The Constitution prohibits a prosecutor from making race-conscious arguments since it draws the jury's attention to characteristics that the Constitution generally demands that the jury ignore." *United States v. Hernandez,* 865 F.2d 925, 928 (7th Cir. 1989) (citations omitted). "Federal courts

have long condemned racially inflammatory remarks during governmental summation." *United States v. Doe,* 903 F.2d 16, 24 (D.C.Cir.1990). "Racial fairness of the trial is an indispensable ingredient of due process and racial equality a hallmark of justice." *Id.* at 25. "Appeals to racial passion can distort the search for truth and drastically affect a juror's impartiality." *Id.* "The impropriety of pleas capable of arousing racial biases is consistently recognized even when they fall short of the danger zone, or are justified by the circumstance." *Id.* at n. 63. The issue here is whether the references distorted the search for truth and drastically affected the impartiality of the jury. The remarks must be considered within the context of the entire trial, and the remarks must be found to have been inflammatory and prejudicial to the petitioner. *U.S. v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). In *United States v. Hernandez, supra,* the prosecutor in his closing argument referred to the defendants as "Cuban drug dealers." *Id.* On the issue of prosecutorial misconduct, the Seventh Circuit explained that "[t]he prosecutor's remark was not intentionally injected into volatile proceedings where the prosecutor had targeted the defendant's ethnic origin for emphasis in an attempt to appeal to the jury's prejudices." *Hernandez,* 865 F.2d at 928. The *Hernandez* court emphasized that while the "prosecutor's reference may have been inappropriate ... there is no evidence that this singular comment was a deliberate attempt to play upon the prejudices of the jury." *Id.*

On this issue of race the Indiana Supreme Court found no impropriety and explained:

> Smith claims the State's final argument was calculated to inflame the passions of the jury through appeals to racial prejudice. Smith proposes the comment that Earl Resnover was "stuck, by his own stupidity" in a bedroom is an "indirect, but unmistakable reference to the race of the Defendants". He makes the same charge regarding a reference to the persons who simply carry out orders as "these privates," and the group of persons as "the boys". These terms are used as general slang, not a racial comment. Smith pro-

fesses to see a racial reference to the remark "this one and that one ...", referring to argument that there was a conspiracy between this defendant and that defendant. These remarks are not inherently racial comments. Two other phrases are discussed by Smith. First, the prosecutor characterized the testimony of a black defense witness as "shucking and jiving on the stand." The term is clearly of black origin, used to mean to talk in a patently misleading or evasive manner. Its use reminds the jury of the untrustworthy appearance of this witness. Second, the prosecutor said Smith "had to play Superfly" and shoot Ohrberg where he lay. Despite the racial content of the term "Superfly", it is not out of bounds to make such an allusion by saying Smith acted like "Superfly", either to characterize his actions by comparison with a known fictional figure, or to imply that Smith's behavior is to some extent modeled on the fictional example.

*Smith II*, 516 N.E.2d at 1064.

The prosecution's above mentioned references are opaque and limited in scope. The prosecutor should however have refrained from such statements. *See, U.S. v. Dominguez*, 835 F.2d 694, 700 (7th Cir.1987). That is clear. The issue here is whether the prosecutor's discourse was prejudicial to the verdict in this case. The evidence of guilt in this case is overwhelming. The prosecutor's remarks did not interfere with the impartiality of the jurors. A reference of this nature in the scope of the entire trial does not make the verdict suspect.

The petitioner included several more excerpts from the prosecutor's closing argument and alleged the statements illustrate misconduct of a constitutional magnitude. It should be noted that *no objections* were made to any of the prosecutor's statements. In *United States v. Reed*, 2 F.3d 1441 (7th Cir.1993), the Seventh Circuit, speaking through Judge Coffey, explained the requisite considerations on the issue of prosecutorial misconduct:

To succeed in his claim, [the petitioner] must demonstrate that "the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (citation omitted).

"When analyzing allegations of prosecutorial misconduct during argument, we look at the disputed remarks in isolation to determine if they are proper. If the statements are proper, our analysis ends. If the statements are improper, our second step is to look at the remarks in light of the entire record to determine if the defendants were deprived of a fair trial."

*United States v. Badger*, 983 F.2d 1443, 1450 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993). *Id.* at 1450. The five factors to be considered when weighing the propriety of a prosecutor's comment include: 1) the nature and seriousness of the prosecutorial misconduct; 2) whether the prosecutor's statements were invited by conduct of defense counsel; 3) whether the trial court instructions to the jury were adequate; 4) whether the defense was able to counter the improper argument through rebuttal; and 5) the weight of the evidence against the defendant. *Id.*

The petitioner asserts that the prosecutor "scored a quadruple violation ... in which he (1) asserts facts concerning the character of the victim which were not in the record; (2) states his personal belief as to the central fact in controversy; (3) misstates the evidence; and (4) vouches personally for the credibility of a key witness and the integrity of the victim." *See Traverse Memorandum*, at 53. Here, the petitioner includes the following excerpt:

I want to go over the evidence, and I want, from this evidence, to learn with you about this man who died. Because in learning about him, the conspiracy to kill him becomes very obvious. Jack was a man who had high respect for individual rights of all citizens. Even though he took a lot of cops with him, to serve those warrants. Even though he sent people to the back to protect themselves. Jack knocked, and I believe that's true. If you think Louie Christ is lying, Okay fine. But you know he's not.

You know he's telling the truth. He knocked, and he announced. Because everybody's got a right to their own privacy. So he knocked and announced his purpose and authority. Police, open up. I know that much about Jack. You could see it in his conduct, that he believed in the rules. And followed them.

*Id.*

On the issue of prosecutorial misconduct, the petitioner asserts that "[t]his is the very type of argument criticized in *United States v. Young,* 470 U.S. 1, 18, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985):

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury but known to the prosecutor, supports the charge against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*Traverse Memorandum* at 54. The petitioner continues to refer to *United States v. Young* in conjunction with other excerpts of alleged prosecutorial misconduct.

In addition, the prosecutor referred to a lawyer-client relationship with the victim and with other police witnesses who had testified for the prosecution during the trial:

> And there is a rule that says that lawyers cannot infer or imply to the jury that he possesses information that's not before them, and I won't do that, because I don't. In my estimation you know all there is to know. There's another rule that says we [lawyers] can't testify, we can't give facts. Well, I was Jack Ohrberg's associate in law enforcement for a long time. And as he was Homicide Supervisor and since, I was his lawyer, the same as I'm [the lawyer for the police witnesses]. So that would be easy to do so, but I'm gonna do it.

*Traverse Memorandum* at 52. This excerpt, according to the petitioner, is exacerbated by

the "negative phrasing at the end of this statement [which] does nothing but emphasize the message that the prosecutor did have inside information about the case because of his close and professional relationship with the police." *Id.* The petitioner maintains that the prosecutor engaged in improper argument during his rebuttal argument. Here, the petitioner includes this excerpt:

> Now [Resnover's lawyer] has known me for a long time and every time I try a case with him he gets more and more into predicting my behavior. And he's about always right. Tom knows that I'm going to get upset before this is over with. And he knows I'm right. Because we're dealing with the loss of a very sacred life. And the life of a very important man. Just like every other man is important.

*Traverse Memorandum,* at 52. According to the petitioner, the prosecutor returned to this theme later by reprising the same theme:

> Now I don't want these guys convicted of anything because my friend died. I want them convicted because they did it.

*Id.* The petitioner maintains that "throughout his argument" [the prosecutor] claimed a close personal relationship with the victim as "my friend" and "my detective". *Id.*

The Indiana Supreme Court in *Smith II* evaluated the issue of prosecutorial misconduct and found none:

> Smith claims that during closing argument, the State included statements of personal belief in the guilt of the accused, intimated knowledge of facts outside the record, and misstated the evidence. The prosecutor's final argument may point out any reasonable inference from facts in evidence. Further, a prosecutor may comment on the credibility of witnesses in closing argument as long as the assertions are based on reasons which arise from the evidence. *Rhone v. State* (1986), Ind., 492 N.E.2d 1063, 1066. The prosecutor said he believed it was true Ohrberg knocked before entering and announced he was a policeman. This comment is premised on a statement that it is based on evidence in

the case, not on any outside knowledge about Ohrberg. Garrison also appealed to the jury to make the conviction on the evidence only. This was not improper argument.

Smith claims that during closing argument, the State included statements of personal belief as to the lack of credibility of witnesses associated with the defendants. When the prosecutor argued that one of the witnesses was lying, he was arguing factual reasons based on evidence and circumstances properly before the court and in the record to reach those conclusions. Thus, he was not making personal comment on their credibility.

*Smith II,* 516 N.E.2d at 1063–64.

In *United States v. Auerbach,* 913 F.2d 407 (7th Cir.1990), the Seventh Circuit evaluated the closing argument of a prosecutor for misconduct. In *Auerbach,* the defendant claimed that "the prosecutor impermissibly expressed his personal opinion of [the defendant]'s guilt to the jury." *Id.* In examining this claim, the court explained that the prosecutor made the following statement during his closing argument:

So, there is no doubt with regards to [the defendant]. You can accept his defense or reject his defense, and it is of no concern because it is the Government's case which has shown that [the defendant] joined the conspiracy and in the months charged in those counts possessed the requisite amount of marijuana, as stated with the intent to distribute it and he is/guilty. . . .

\* \* \* \* \* \*

The question is, did we prove it beyond a reasonable doubt, and there is no reasonable doubt in this particular case. [The defendant] has done what he is charged with. [Another defendant] has done what he is charged with. Convict them.

*Id.* at 418.

On the issue, the *Auerbach* court "decline[d] to adopt the defendant's curious view that it is improper for the prosecutor to argue to the jury that a defendant is guilty." *Id.* The court explained that while it "is correct that it is improper for the prosecutor to express his personal opinion about a de-

fendant's guilt, *see United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), . . . the prosecutor did not do so." *Id.* Similarly, when the prosecutors here stated "I want them convicted because they did it," it is juxtaposed with references to the evidence. Or this statement outlined above:

Jack knocked, and I believe that's true. If you think Louie Christ is lying, Okay fine. But you know he's not. You know he's telling the truth. He knocked, and he announced.

*Traverse Memorandum,* at 53.

Here, as in *Auerbach,* "the comment cited by the defendant was prefaced by a reference to the government's case; the prosecutor's statements were simply a permissible comment upon what the evidence showed and not a statement of his personal opinion regarding the defendant's guilt." *Auerbach,* 913 F.2d at 418. "Moreover, there is no indication that the prosecutor was attempting to influence the jury's evaluation of the evidence by implying that they should defer to an opinion based on his experience, expertise, or insider's knowledge of the case." *Id.*

Another excerpt from *Auerbach,* is of value here. The defendant in *Auerbach:*

also contends that the prosecutor improperly bolstered his case by referring to his position as a government official. In response to defense counsel's closing argument that the government was conducting a "witch hunt" and that its witnesses had coordinated and fabricated their testimony, the prosecutor asked the jury:

Is that what you think your government is doing, getting people together and getting their stories together? If we were going to do that there wouldn't be any mistakes. But that wasn't done. These people testified from what they knew, and if they couldn't identify somebody, they didn't. And if they didn't remember an exact date they didn't change it.

[Clearly, it is] impermissible for the prosecutor to strengthen its case by invoking the prestige of the United States government.

*Auerbach, supra* citing *United States v. Eley,* 723 F.2d 1522, 1525 (11th Cir.1984). Here, although the prosecutor refers to his relationship with law enforcement officers, a reference to the fact that the prosecutors have to work closely with law enforcement officers does not necessarily represent an attempt to improperly sway the jury's evaluation of the evidence.

In *United States v. Mazzone,* 782 F.2d 757 (7th Cir.1986), the Seventh Circuit evaluated the issue of prosecutorial misconduct. The *Mazzone* court explained the prosecutor's closing argument thusly:

> He said such things as, "I know as good defense lawyers it is their job to defend their clients, no matter how guilty they may perceive them...." And: "I took an oath to uphold the laws of the United States, that was one of the most important things I ever did, and, of course, if the government's case here today is a lie, then I haven't been upholding that oath." And: "as an Assistant United States Attorney I am proud to be in this case.... I think ... these agents did exactly what they were supposed to have done and they have helped rid the community of these dope peddling defendants." He described some defense documents as "forged-up documents," and repeatedly described the closing argument by the defendants' lawyers as "malarkey" and "hogwash." The district judge sustained several objections to the argument and told the jury to pay no heed to the objectionable remarks.

*Id.* at 762.

In *Mazzone,* the court indicated that the dispositive issue on prosecutorial misconduct is "whether the error of the prosecutor's ways was harmless, or as the cases usually say, did not prejudice the defendants' right to a fair trial." *Id. (citing United States v. Brack,* 747 F.2d 1142, 1152–53 (7th Cir. 1984)); *United States v. Bagaric,* 706 F.2d 42, 58–59 (2d Cir.1983); *United States v. Haskins,* 737 F.2d 844, 850 (10th Cir.1984); *United States v. Falk,* 605 F.2d 1005, 1014 (7th Cir.1979). In evaluating whether "the impact seems to have been nil ("harmless"), that is just another way of saying that the trial was not poisoned, [the *Mazzone* court,

speaking through Judge Posner, explained that] due process was not denied and reversible error was not committed." *Id.* Specifically, the *Mazzone* court explained:

> At least within limits; for in a close case, egregious prosecutorial misconduct might require us to overturn the trial judge's finding that it had not prejudiced the jury's consideration of the case. Cf. *Joseph v. Brierton,* 739 F.2d 1244, 1247–48 (7th Cir.1984). This, however, was not a close case, The evidence against the appellants was overwhelming; it included substantial eyewitness evidence.... The prosecutor's remarks, those we quoted above and a few more like them (but somewhat less objectionable), must be placed in the context of a [the entire closing argument], the rest of which was unobjectionable.... It is almost inconceivable that if the prosecutor had refrained from making the remarks that he did, the appellants would have been acquitted. It is more likely that the judge's admonitions reduced the stature of the assistant U.S. attorney in the jury's eyes than that the remarks that were admonished swayed the jury. That does not excuse the government's conduct, of course. It makes it, if anything, less excusable; in Talleyrand's phrase, it was worse than a crime, it was a blunder.
>
> So while we reprimand the government for the prosecutor's conduct and for its attempt to defend that conduct before us, we do not find reversible error, a conclusion reinforced by the very large number of cases that refuse to reverse convictions for prosecutorial excesses of the kind committed here. See, e.g., *United States v. Howard,* 774 F.2d 838, 847–49 (7th Cir. 1985) (prosecutor said, "My job is to bring out the truth," etc.); *United States v. West,* 670 F.2d 675, 689 (7th Cir.1982) ("The government doesn't need cases"); *United States ex rel. Clark v. Fike,* 538 F.2d 750, 758 (7th Cir.1976) ("I [the prosecutor] work for you as well as for the defendant"); *United States v. Strmel,* 744 F.2d 1086, 1089 (5th Cir.1984) ("thank God for Customs and the Drug Enforcement Administration.... Thank God for their diligence and their expertise"); *United*

*States v. Shackelford*, 709 F.2d 911, 913 (5th Cir.1983) (per curiam) ("You [the jury] were to be tricked [by defense counsel]"); *United States v. Esposito*, 523 F.2d 242, 251 (7th Cir.1975) (prosecutor described defendant as "the lowest form of life in the country").

*Id.* at 764. Here, as in the words of Judge Posner "[i]t is almost inconceivable that if the prosecutor had refrained from making the remarks that he did, the [petitioner] would have been acquitted." *Id.*

In *United States v. Pirovolos*, 844 F.2d 415 (7th Cir.1988), the Seventh Circuit admonished that "[w]hen the seriousness of prosecutorial misconduct and the weakness of evidence of guilt cause us to question a trial's fairness, we will not hesitate to reverse the resulting conviction and order a new trial." This court concurs. The Constitution guarantees a fair trial, not a perfect one. *See, e.g., Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *United States v. Hasting*, 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980–81, 76 L.Ed.2d 96 (1983). It is manifest, as Justice Sutherland so correctly stated, that the prosecutor "may strike hard blows, [but] is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Here, this court finds no such due process violation.

Any doubt about this court decisions on the allegations of prosecutorial misconduct are likely dispelled in light of the recent and dispositive Supreme Court opinion of *Brecht v. Abrahamsom*, —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See also United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (the Supreme Court applied a "harmless error" analysis to prosecutorial misconduct). In *Brecht*, the Supreme Court revisited harmless error within the framework of habeas corpus and prosecutorial misconduct. In *Brecht*, the Court, speaking through Chief Justice Rehnquist, considered the issue of the applicable standard for the review of federal constitution error. In *Brecht*, the petitioner "was serving time in a Georgia prison for felony theft when his sister and her husband[, who was a county prosecutor,] ... paid the resti-

tution for petitioner's crime and assumed temporary custody of him." *Id.* The petitioner's sister and husband brought the petitioner "home with them to ... Wisconsin, where he was to reside with them before entering a halfway house." *Id.* The petitioner's behavior while residing with his in-laws was a source of very serious contention especially on the topic of drinking alcohol. On the day of the crime, the "petitioner broke into their liquor cabinet and began drinking." *Id.* When his sister's husband returned home, the petitioner shot him with a rifle he had found in an upstairs room. The shot was fatal.

The petitioner in *Brecht* sought a writ of habeas corpus based on the decision in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), which prohibits a prosecutor's use of post-*Miranda* silence. The District Court agreed with the petitioner that the precepts of *Doyle* were violated during the state criminal trial. More importantly, the District Court found that the violation amounted to error that was harmless beyond a reasonable doubt. In so doing, "the District Court based its harmless-error determination on its view that the State's evidence of guilt was not 'overwhelming,' and that the State's references to petitioner's post-*Miranda* silence, though 'not extensive,' were 'crucial' because petitioner's defense turned on his credibility." *Id.* —— U.S. at ——, 113 S.Ct. at 1715. The District Court granted the writ on this basis.

The Seventh Circuit reversed. The Seventh Circuit "concluded that the State's references to the petitioner's post-*Miranda* silence violated *Doyle*, but it disagreed with both the standard that the District Court had applied in conducting its harmless-error inquiry and the result it reached." *Id.* at ——, 113 S.Ct. at 1716. The Seventh Circuit held "that the *Chapman v. California*, 386 U.S. 18, [87 S.Ct. 824, 17 L.Ed.2d 705 (1967)], harmless-error standard does not apply on federal habeas." *Id.* According to the Seventh Circuit, the test is whether the *Doyle* violation "had substantial and injurious effect or influence in determining the jury's verdict," which is the standard enunciated by the Supreme Court in *Kotteakos v. United*

*States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *Id.*

Upon review the Supreme Court instructed that "a *Doyle* error fits squarely into the category of constitutional violations which we have characterized as 'trial error.'" *Id.* —— U.S. at ——, 113 S.Ct. at 1717. Next, the Court pointed out that the federal habeas statute "says nothing about the standard" and that "[i]n the absence of any express statutory guidance from Congress, it remains for this Court to determine what harmless-error standard applies on collateral review...." *Id.* at ——, 113 S.Ct. at 1719. Finally, and most importantly, the Court explained that:

> The principle that collateral review is different from direct review resounds throughout our habeas jurisprudence. *See e.g., Wright v. West,* 505 U.S. ——, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (opinion of THOMAS, J.); *Teague v. Lane,* 489 U.S. 288, 306, 109 S.Ct. 1060, 1072, 103 L.Ed.2d 334 (1989) (opinion of O'CONNOR, J.); *Pennsylvania v. Finley,* 481 U.S. 551, 556–557, 107 S.Ct. 1990, 1994, 95 L.Ed.2d 539 (1987); *Mackey v. United States,* 401 U.S. 667, 682, 91 S.Ct. 1160, 1174, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgments in part and dissenting in part). Direct review is the principal avenue for challenging a conviction. "When the process of direct review—which, if a federal question is involved, includes the right to petition this Court for a writ of certiorari—comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 3392, 77 L.Ed.2d 1090 (1983).
>
> In keeping with this distinction, the writ of habeas corpus has historically been regarded as an extraordinary remedy, "a bulwark against convictions that violate 'fundamental fairness.'" *Engle v. Isaac,* 456 U.S. 107, 126, 102 S.Ct. 1558, 1571, 71 L.Ed.2d 783 (1982) (quoting *Wainwright v.*

*Sykes, supra,* 433 U.S. [72] at 97, 97 S.Ct., [2497] at 2511 [53 L.Ed.2d 594] [(1977)] (Stevens, J., concurring)). "Those few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia,* 372 U.S. 391, 440–441, 83 S.Ct. 822, 850, 9 L.Ed.2d 837 (1963). See also *Kuhlmann v. Wilson,* 477 U.S. 436, 447, 106 S.Ct. 2616, 2623, 91 L.Ed.2d 364 (1986) (plurality opinion) ("The Court uniformly has been guided by the proposition that the writ should be available to afford relief to those 'persons whom society has grievously wronged' in light of modern concepts of justice") (quoting *Fay v. Noia, supra,* 372 U.S. at 440–441, 83 S.Ct., at 850); *Jackson v. Virginia,* 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 2785, n. 5, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment) (Habeas corpus "is designed to guard against extreme malfunctions in the state criminal justice systems"). Accordingly, it hardly bears repeating that "'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.'" *United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982) (quoting *United States v. Addonizio,* 442 U.S. 178, 184, 99 S.Ct. 2235, 2239, 60 L.Ed.2d 805 (1979)).

*Id.* —— U.S. at —— – ——, 113 S.Ct. at 1719–20. Therefore, the *Brecht* Court held that the requisite standard was whether the prosecutorial misconduct "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* This court finds that any alleged prosecutorial misconduct did not have a substantial and injurious effect on the verdict. Borrowing on the language of Justice Sutherland in *Berger v. United States, supra,* the prosecutorial blows struck here were within the outer limits of hard ones and were not foul ones.

### C. Misleading Evidence

█ The petitioner contends that the prosecutors at trial did not exercise reasonable care to prevent the jury from being exposed to misleading evidence. On this issue, the petitioner alleges that "[t]o establish [the

petitioner's] guilt of the crime with which he was charged, and to obtain a death sentence for those crimes, the prosecutors dwelt at length upon the claim that [the petitioner] shot the victim twice in the back as he lay helpless on the porch." *Traverse Memorandum,* at 74–5. In arguing this contention, the petitioner explains that the State has recast its claim at trial that the petitioner leaned out of the doorway and fired two shots into a wounded police officer. Specifically, "in the post conviction proceedings the state made no effort to support this claim and, when challenged, offered the alternative theory that Ohrberg was hit three times as he stood in the doorway." *Id.* at 75. This claim is based on the testimony of two police officers that were at the scene of crime—Sgt. Christ and Officer Ferguson, who were in the dark exchanging gunfire on the fateful morning.

The petitioner made the same argument in *Smith II.* The *Smith II* court explained the petitioner's theory in the following fashion:

Smith asserts the evidence is insufficient to support his murder conviction because the physical evidence is irreconcilable with the police testimony. He claims that the evidence of the path of the bullets in Ohrberg's body and the police testimony that Ohrberg fell to his left and lay with his left side away from the shooter when the additional shots were fired, is incompatible with the State's theory that a person appeared in the doorway and shot his weapon at Ohrberg as he lay on the porch. When confronted with this inconsistency at the post-conviction hearing, the State demonstrated that all three wounds could have been inflicted at the time Ohrberg was in the doorway before he fell to the porch. Smith argues that had the jury been informed of this theory, the jury would have considered his claims of self-defense and the mitigating factor of "sudden heat".

*Smith II,* 516 N.E.2d at 1061. The Indiana Supreme Court explained further:

Smith's contention treats the physical evidence as conclusively disproving the State's theory and suggests that the evidence is so obviously inconsistent with the State's theory that the State acted improperly. This claim is merely an interpretation of selected evidence in the light most favorable to Smith. Resnover, in his post-conviction case, also pursued an interpretation of the evidence which, it was claimed, showed it was impossible for the wounds in Ohrberg's body to have been inflicted while he lay on the porch. This Court found the argument was actually "a new defense theory on the sufficiency of the evidence based on inferences drawn from selected use of trial testimony" and that it was not error to deny a motion for relief based on this alleged inconsistency. *See Resnover,* 507 N.E.2d at 1389–90.

Furthermore, Smith's conviction does not depend on showing that he emerged on the porch and shot Ohrberg as he lay there. The evidence here supports the inference that the people in the duplex knew policemen were at the door. The officers knocked more than once and said they were police officers. The neighbor heard shouts that it was the police, and the noise of things being moved next door. The people in the front room starting shooting as soon as the police opened the door. Smith was one of the people in the front room. Ohrberg was clearly shot by a person from inside the house. Officer Foreman testified there were muzzle blasts from two locations within the front room, separated by a distance of some feet. Ohrberg managed to return fire, and Smith was wounded. Perhaps Smith was wounded and unable to go out on the porch and shoot. Perhaps the figure on the porch somehow managed to miss Ohrberg as he lay there, and all Ohrberg's wounds were incurred in the initial shooting. The jury reasonably inferred from the evidence that Smith was one of the persons in the front room shooting at Ohrberg, and that Smith intended to kill Ohrberg or acted in support of the plan of others to kill Ohrberg to the extent that Smith acted in these crimes with reckless disregard of the possible consequence of loss of human life.

*Id.* at 1061–62. The above mentioned discussion presents no constitutional error under *Jackson v. Virginia, supra.*

The petitioner also contends that the evidence supporting the petitioner's conviction of conspiracy to murder Sgt. Ohrberg is constitutionally insufficient under the standard of *Jackson v. Virginia, supra*. On this issue, the petitioner explains that "[t]he Indiana Supreme Court ... [has] refused to face up to the implications of the prosecutor's hasty and ill-considered choice to 'load up' the charges against [the petitioner] and his codefendant that they had, for a long time prior to the shooting, planned to kill Ohrberg." *Traverse Memorandum*, at 80. In denying that the prosecution proved a conspiracy under *Jackson*, the petitioner argued:

The conspiracy statue requires proof beyond a reasonable doubt that (1) Smith; (2) with intent (conscious objective) to murder Ohrberg; (3) agreed with others having the same intent (conscious objective); (4) to murder (intentionally or knowingly kill) Ohrberg; and (5) performed an overt act in furtherance of the agreement.... This, and no other, is the charge that must be sustained by the evidence. The allegation was not, as the Court seemed to assume on Smith's direct appeal, a conspiracy arising from a spontaneous and tacit agreement born on the morning of December 11, 1980. See 465 N.E.2d at 1121. Neither was the allegation that which was misrepresented to the Indiana court by the State—that Smith and the others had a general agreement to shoot it out with the police whenever that occasion might occur (as opposed to killing Ohrberg whenever they got the chance).

*Traverse Memorandum*, at 81.

In addressing the petitioner's "challenges the evidence supporting his conviction for conspiracy, claiming the State's theory of conspiracy is merely a device concocted to gain introduction of evidence that would otherwise have been inadmissible, and thus increase the chances of convicting Smith of murder and of obtaining the death penalty," the Indiana Supreme Court explained:

The State was required to prove beyond a reasonable doubt that Smith, with the intent to murder Ohrberg, agreed with others to murder Ohrberg, and that an overt act in furtherance of the agreement was performed. Ind.Code Ann. § 35–41–5–2 (Burns 1985). The existence of the agreement may be inferred from the conduct of the parties or proved by circumstantial evidence, but not from the commission of the criminal act alone. *Woods v. State* (1980), 274 Ind. 624, 626, 413 N.E.2d 572, 573. "Concurrence of sentiment and cooperative conduct in the criminal enterprise. are the essential ingredients." *Woods*, 274 Ind. at 633, 413 N.E.2d at 577. Here, five persons were gathered in an apartment with several guns, ammunition and related paraphernalia. One of the persons had in his wallet Ohrberg's business card with Ohrberg's wife's name and telephone number handwritten on the back. A piece of furniture was placed in front of the door. Being aware that a policeman was entering the building, Smith fired on Ohrberg as the officer tried to enter the house. From this evidence the jury could reasonably infer a conspiracy to murder Ohrberg.

*Smith II*, 516 N.E.2d at 1062

Here, the petitioner is using this petition "as a back door to review questions of substantive law." *Bates v. McCaughtry*, 934 F.2d 99, 103 (7th Cir.1991). In *Bates*, the petitioner asserted that his state criminal conviction was unconstitutional because the state misapplied state law; and therefore, violated the pronouncements of *Jackson v. Virginia, supra*. On this issue, the Seventh Circuit, speaking through Judge Easterbrook, explained that "*Jackson* [*v. Virginia, supra*] prevents the state from evading the burden of persuasion established by the due process clause of the fourteenth amendment." *Id.* at 101. (citing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)); *see also Jones v. Thieret*, 846 F.2d 457 (7th Cir.1988).

In explaining that the petitioner "cannot obtain a second opinion on the meaning of state law through the maneuver of making a claim under *Jackson*," the *Bates* court explained:

*Jackson* establishes that states must act on the basis of sufficient evidence. The principle seems unproblematic: it is barbaric to imprison persons who no reasonable

juror could think had committed a crime. Implementing *Jackson* is not so easy as stating its principle, however. Judgments represent the application of law to fact. Evidence can be "insufficient" only in relation to a rule of law requiring more or different evidence. When a state court enters or affirms a conviction, it is saying that the evidence satisfies the legal norms. These norms are for the state to select. State law means what state courts say it means. *See, e.g., Garner v. Louisiana,* 368 U.S. 157, 166, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961) ("We of course are bound by a State's interpretation of its own statute and will not substitute our judgment for that of the State's when it becomes necessary to analyze the evidence for the purpose of determining whether that evidence supports the findings of a state court."); *Hebert v. Louisiana,* 272 U.S. 312, 316–17, 47 S.Ct. 103, 71 L.Ed. 270 (1926); *Patterson v. Colorado,* 205 U.S. 454, 459–61, 27 S.Ct. 556, 51 L.Ed. 879 (1907). A claim that the state court misunderstood the substantive requirements of state law does not present a claim under § 2254. "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984). *See also, e.g., Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982). The difference between unreviewable legal interpretations and factual claims open under *Jackson* establishes a formidable problem of implementation.

*Id.* at 102. *See also, Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

### D. Sentencing Phase

The petitioner contends numerous errors were committed during the sentencing phase of the trial. The petitioner alleges that the death penalty charging process in Indiana is unconstitutional and the issue should be confronted in light of the special facts presented in this case.

■ On this issue, the petitioner argues that the Eighth Amendment is violated insofar as the state of Indiana provides for no neutral buffer between the prosecutor's charging decision and the commencement of a death penalty trial. Specifically, the petitioner contends that "Indiana is one of only three United States jurisdictions that permit prosecutors to initiate death penalty proceedings by information without neutral screening of the evidence supporting the murder charge or the claimed aggravating circumstance." *See Traverse Memorandum,* at 91 *citing Schornhorst, Preliminary Screening of Prosecutorial Access to Death Qualified Juries: A Missing Constitutional Link,* 62 *Ind.L.J.* 295, 301–03 (1987). It will take a higher court than this one to turn this law journal article into constitutional law.

This trail is well marked. In response to the broad challenge to prosecutorial discretion rejected in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), Justice White wrote:

> Petitioners's argument that prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies is unsupported by any facts. Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. *Absent facts to the contrary,* it cannot be assumed that prosecutors will be motivated in their charging decisions by factors other than the strength of their case and the likelihood that a jury would impose the penalty if it convicts.

*Id.* 428 U.S. at 225, 96 S.Ct. at 2949. This court does not accept the petitioner's assertion that a prosecutor's decision at this stage of the proceedings will be tainted by any "caprice and emotion." As the Court stated in *McCleskey v. Kemp,* 481 U.S. 279, 313, 107 S.Ct. 1756, 1778, 95 L.Ed.2d 262 (1987), "[where] the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious." *Id.* This issue is no different when considered in light of *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). This petitioner through his very able counsel is in effect arguing that state criminal prosecutions where the death penalty is requested must be the result of a

grand jury indictment. Over the strong dissent of Justice Harlan I the Supreme Court of the United States specifically rejected that argument 110 years ago in *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884). That decision has since withstood the incorporation of the Bill of Rights (Amendments I–VIII) into Amendment XIV.

The petitioner alleges that he was denied a fair sentencing hearing due to the failure of the trial judge to instruct the jury to draw no adverse inference from the petitioner's exercise of his right not to attend the hearing. On this issue, the Indiana Supreme Court explained:

> After conviction, against the advice of counsel, Smith and Resnover decided not to attend the sentencing phase of the trial. A hearing was held to determine the voluntariness of Smith's choice. The judge characterized the waiver as "the ultimate affront to the law," and said, "what we have seen here in court today is a black and shameful day. In the law. For all those people who have come before us to get this law-given sacred right." This Court has already noted that the trial judge's remarks were made outside the presence of the jury and did not prejudice the jury. *Smith*, 465 N.E.2d at 1124.
>
> Smith argues the trial court had the obligation to, sua sponte, instruct the jury that he had a constitutional right to be absent and that no adverse inference could be drawn from that fact, citing *Barnes v. State* (1982), Ind., 435 N.E.2d 235, 240–41. In *Barnes*, this Court recognized the correct action for a judge to take in such circumstances. However, *Barnes* was handed down after Smith. Further, the defendant in *Barnes* claimed it was error for the trial court to give such an instruction, and that such an instruction was equivalent to improper comment on the defendant's decision not to testify. Thus, *Barnes* does not establish that a trial court must sua sponte instruct a jury that the defendant has the right to be absent and that his absence should not be held against him.

*Smith II*, 516 N.E.2d at 1062–63.

The petitioner alleges that "when advised of [the petitioner's] decision not to attend the sentencing trial, the judge held a hearing outside the presence of the jury to determine the voluntariness of his choice." *Traverse Memorandum*, at 87. The petitioner contends that during the course of the hearing Judge Boles, without objection by defense counsel, advised the petitioner: "Do you understand that if you choose not to be here in court the State may comment on the fact that you have chosen not to be here, and tell this jury that you told them that you didn't want to be here and you chose to leave?" *Id.* The state trial judge in this trial made this statement during the hearing to determine the ramifications of the choice made by Resnover and the petitioner to not attend the hearing.

■ The petitioner finds impropriety in the following statement: "And what we have seen here in court today is a black and shameful day. In the law. For all those people who have come before us to get this law-given sacred right." *Id.*, at 87–8. This court concurs with the Indiana Supreme Court's conclusion that the latter remark is not and can not be prejudicial because the statement was made while the jury was out of the courtroom.

This issue, as presented by the petitioner, requires this court to ascertain the constitutional ramifications of an unprecedented event—unprecedented in the state of Indiana. This trial state trial judge faced a very difficult situation. Prior to closing arguments, *the judge told the jury that "the defendants are not present by choice but are present by their attorneys...."*

■ Here, it is clear that the petitioner waived his right to attend the sentencing phase of the trial. A waiver is "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). A finding of a knowing and voluntary waiver of this right is certainly a finding of fact and entitled to a presumption of correctness in federal habeas corpus proceedings. *Sumner v. Mata*, 455 U.S. 591, 591–93, 102 S.Ct. 1303, 1304–05, 71 L.Ed.2d 480 (1982).

Next, the issue is whether the petitioner can waive the right to be at penalty phase of a capital case. In *Campbell v. Blodgett*, 978 F.2d 1502 (9th Cir.1992) (subsequent history omitted) the Ninth Circuit considered the issue of whether "a defendant in a capital case can ... waive the right [to be present] at the empaneling of the jury." *Id.* On this issue, the *Blodgett* court explained:

In *Illinois v. Allen*, the Court recognized that the defendant can waive the right involuntarily through his disruptive conduct at trial. The Court held that the right to be present did not extend to a defendant who "insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Allen*, 397 U.S. [337] at 343 [90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970)].

The ability of the defendant voluntarily to waive his presence at a criminal trial was recognized in *Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973). There, the defendant did not return to the courthouse after the first morning of trial and the trial proceeded in his absence. The Court held that this voluntary absence constituted a waiver of his right to be present. The Court went even further in holding that the defendant need not have been expressly warned of his right to be present and that it was not necessary to have an express waiver on the record. The defendant's failure to attend and assert his right was construed as a voluntary waiver. *Id.* at 19–20, 94 S.Ct. at 195–196.

In *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), the Court held that the defendant had waived his right to be present at a conference between the judge, defense counsel, and a juror who had been concerned because he had noticed that the defendant was drawing sketches of the jurors. The Court held that the failure to object constituted a waiver, id. at 529 [105 S.Ct. at 1485], and that an express waiver on the record was unnecessary. *Id.* at 528 [105 S.Ct. at 1485].

*Id.* at 1510.

The *Blodgett* court explained that "in the case before us, [the petitioner] not only expressly waived his right to be present but it was he who requested and, in fact, insisted upon his absence." *Id.* The petitioner and Resnover both expressly waived their rights and *insisted upon being absent* during the penalty phase of the trial. The *Blodgett* court continued:

The conclusion that a defendant may voluntarily waive the right to be present is consistent with the 1975 amendments to the *Federal Rules of Criminal Procedure*. In federal criminal trials, the rules prior to 1975 provided that "in prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict." *Fed. R.Crim.P.* 43, quoted in *Allen*, 397 U.S. at 343 n. 2 [90 S.Ct. at 1060 n. 2].

Following *Allen*, Congress amended *Fed.R.Crim.P.* 43 to incorporate the Allen holding. In so doing, it omitted the language that limited waiver of presence to noncapital cases. The Advisory Committee on Rules explicitly left the issue open for development by the courts. The Notes state:

The defendant's right to be present during the trial on a capital offense has been said to be so fundamental that it may not be waived. *Diaz v. United States*, 223 U.S. 442, 455, 32 S.Ct. 250, 56 L.Ed. 500 (1912) (dictum); *Near v. Cunningham*, 313 F.2d 929, 931 (4th Cir. 1963); *C. Wright, Federal Practice and Procedure: Criminal* § 723 at 199 (1969, Supp.1971).

However, in *Illinois v. Allen, supra* the court's opinion suggests that sanctions such as contempt may be least effective where the defendant is ultimately facing a far more serious sanction such as the death penalty. 397 U.S. at 345 [90 S.Ct. at 1061]. The ultimate determination of when a defendant can waive his right to be present in a capital case ... is left for further clarification by the courts.

18 U.S.C. app. Rule 43, Notes of Advisory Committee on Rules—1974 Amendment (1988) (emphasis added) (citations omitted).

We thus must consider whether the rule allowing voluntary waiver is applicable to capital cases. First we note the limitation of our inquiry. Campbell's absence in this case does not involve Sixth Amendment Confrontation Clause issues, as no witness or evidence was presented in his absence. We are concerned only with the due process considerations involved because of his absence from the jury voir dire. *See Gagnon,* 470 U.S. at 526, 105 S.Ct. at 1484. Whether the waiver of Sixth Amendment rights would invoke different considerations in a capital case, we leave for another day.

Campbell expressed his desire not to be present during the selection of the jury because he wanted to prepare for his part in the trial. Justice Frankfurter noted in *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279–80, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942), the importance of allowing criminal defendants some flexibility to reject procedural safeguards written into the Constitution:

> The procedural safeguards of the Bill of Rights are not to be treated as mechanical rigidities. What were contrived as protection for the accused should not be turned into fetters.... To deny an accused a choice of procedure in circumstances in which he, though a layman, is as capable as any lawyer of making an intelligent choice, is to impair the worth of great Constitutional safeguards by treating them as empty verbalisms.
>
> ... When the administration of the criminal law in the federal courts is hedged about as it is by the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards ... is to imprison a man in his privileges and call it the Constitution.

*Id.* We conclude that allowing the defendant this choice in a capital case does not offend due process. Although the trial judge need not have granted Campbell's request, he did not commit constitutional error in doing so.

*Id.* at 1510–11. The Ninth Circuit reaffirmed their *Campbell v. Blodgett* observations when they spoke on the subject again in *Campbell v. Wood,* 18 F.3d 662 (9th Cir.1994), *reh'g, en banc, denied,* 20 F.3d 1050 (9th Cir.1994), *stay denied, cert. denied,* —— U.S. ——, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994).[5] Therefore, it is clear that the petitioner did waive his right and such a waiver is constitutional.

■ On this issue, the state trial judge instructed the jury that the petitioner and Resnover were represented by counsel at the sentencing phase of the trial. This court disagrees with the assertion that the state trial judge should have instructed the jury further. This court notes that in *Federal Jury Practice and Instructions,* the authors explain that "[e]ven in the absence of a request, written or oral, a federal court must charge the jury on the broad fundamental rules of law applicable to the principal issues of fact in the case." *Devitt, Blackmar, Wolff, and O'Malley, Federal Jury Practice and Instructions* § 7.02 Requests for Instructions. "A party is entitled to have proper requested instructions presenting the party's theory of the case given to the jury." *Id.* "In criminal cases the court must instruct on all essential questions of law whether requested or not." *Id.* "Included within this mandate are instructions on the elements of the offense, pertinent lesser included offenses, the Government's burden, [and] the presumption of innocence...." *Id.* The petitioner's counsel requested no instruction on this issue. *See, United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

In an analogous example, the Supreme Court in *Carter v. Kentucky,* 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), evaluated whether a criminal trial judge's refusal of a defendant's request to include the following in the jury instructions: "The defendant is not compelled to testify and the fact that he does not cannot be used as an inference of

---

**5.** Tana Wood was substituted for James Blodgett pursuant to Fed.R.App.P. 43(c).

guilty and should not prejudice him in any way." *Id.* at 290, 101 S.Ct. at 1113–1114. The Court explained that the "Fifth Amendment requires that a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a deferent to do so." *Id.* at 306, 101 S.Ct. at 1122. More importantly to the question at issue here, the Court, speaking through Justice Stewart explained:

> We have repeatedly recognized that "instructing a jury in the basic constitutional principles that govern the administration of criminal justice," *Lakeside [v. State of Oregon]*, 435 U.S., [333] at 342 [98 S.Ct. 1091 at 1096, 55 L.Ed.2d 319] [ (1978) ], is often necessary. Jurors are not experts in legal principles; to function effectively, and justly, they must be accurately instructed in the law. Such instructions are perhaps nowhere more important than in the context of the Fifth Amendment privilege against compulsory self-incrimination, since "[too] many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are ... guilty of crime...." *Ullman [Ullmann] v. United States*, 350 U.S. 422, 426 [76 S.Ct. 497, 500, 100 L.Ed. 511] [ (1956) ]. And, as the Court has stated, "we have not yet attained that certitude about the human mind which would justify us in ... a dogmatic assumption that jurors, if properly admonished, neither could nor would heed the instructions of the trial court...." *Bruno, [v. United States]* 308 U.S. [287], at 294 [60 S.Ct. 198 at 200, 84 L.Ed. 257 (1939)].
>
> A trial judge has a powerful tool at his disposal to protect the constitutional privilege—the jury instruction—and he has an affirmative constitutional obligation to use that tool when a defendant seeks its employment. No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, *but a judge can, and must, if requested to do so, use the unique power of the jury instruction.*

*Id.* at 303, 101 S.Ct. at 1120 (emphasis added by court). Here, as the *Carter* Court explained, insofar as the petitioner's counsel

did not request such an instruction, then it is not manifest that the trial judge do so *sua sponte* especially when encountering such an unpredictable situation created by the petitioner. Trial counsel may well have had valid strategic reasons for this.

■ Next, the petitioner contends that the prosecutor's adverse comment on his waiver of his right to be present were prejudicial. On this issue, the Indiana Supreme Court explained:

> In the State's opening statement, the prosecutor acknowledged that the defendants had a right not to be present, but said nothing about the jury's duty not to draw adverse inferences from their absence.... During closing argument, the prosecutor again took note of the absence of the defendants, remarking, "Let's put the defendants back in the courtroom, don't punish them for their actions, but don't reward them for turning their backs on justice."

*Smith II*, 516 N.E.2d at 1063. This court agrees with the Indiana Supreme Court and finds that again the comments by the prosecutor pass constitutional muster insofar as the comments did not "infect the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986).

■ Finally, on this issue, the petitioner contends defense counsel's comments violated the Sixth Amendment. On this issue, the Indiana Supreme Court explained:

> Also during closing argument, Gregory Resnover's counsel remarked, "I think I may be presumed to say the judge is affronted by the fact that my clients are not here. I am embarrassed by it." These remarks of the court and counsel were reviewed by this Court and found not to be prejudicial. *Resnover*, 507 N.E.2d at 1382.
>
> Smith's defense counsel also noted Smith's absence. In closing argument, Smith's defense counsel remarked "... due to the incredible stupidity and demoralization on the part of ... Mr. Smith, over what happened yesterday, you haven't had the benefit of hearing him speak. To tell his story. At least hearing what he

has to say. At least hearing his voice." He then pled with the jury not to allow that absence to be the basis for favoring the death penalty. The decision what to do after Smith absented himself was a strategic dilemma for counsel. Defense counsel's strategy seems to have been to characterize the absence as unwise, and thus humanize the decision. This Court does not second guess counsel in choices of strategy.... The remarks made by counsel were strategic decisions within the scope of the professional performance expected of counsel.

*Smith II,* 516 N.E.2d at 1063. This court finds no error on this issue under the Sixth Amendment.

The petitioner contends that the prosecutor in his final arguments to the jury during the sentencing phase of the trial violated the standards delineated in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). In asserting this contention, the petitioner indicated that the prosecutor misstated the ruling in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Specifically, the prosecutor rendered the following statement on the meaning of the *Gregg* decision:

> When we participate in a government we say there will be public justice, they will come before a jury and if one of these people does something to me I'll file a criminal charge and ask the prosecutor's office to let a jury decide. And a judge decides what the punishment will be. And that is an important concept, because the [*Gregg*] case a U.S. Supreme Court case on the death penalty says that the reason for the death penalty is retribution. A reason for the death penalty means retribution. And retribution means we will punish you for evil doing. Retribution means deserved punishment. And if we

get to a situation where as an organized society doing public justice we will not give deserved punishment for evil done, then are we not back to private justice. As the U.S. Supreme Court in the [*Gregg*] case has said. When a people begin to believe an organized society is unable or unwilling to impose on the criminal offenders the punishment they deserve, then are sown the seeds of anarchy, of self-help, vigilante justice and lynch law. Why go through this detailed analysis of the death penalty if the facts so reasonably fit? Because the stakes here are real high. Two men's lives and justice. And if we reach, as a society the conclusion that we will not produce punishment, consistent with the evil done, then according to the U.S. Supreme Court, we plant the seeds of self-help and vigilante justice.

*Traverse Memorandum,* at 59–60.[6]

The petitioner argues that this passage imparts to the jury the inaccurate message that the Supreme Court has encouraged the death penalty for the purpose of preventing "anarchy ... self-help, vigilante justice and lynch law." *Id.* The petitioner continues "[w]hile the language quoted by the prosecutor does appear as dictum in the separate opinion of Justice Stewart, it is a serious misrepresentation of the Court's holding in *Gregg.*" *Id.* Finally, and perhaps most importantly here, the petitioner argues the Eleventh Circuit in *Wilson v. Kemp,* 777 F.2d 621 (11th Cir.1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986), found a similar argument improper and fundamentally unfair for purposes of a penalty phase argument. In asserting this argument, the petitioner includes the following excerpt from the court in *Wilson v. Kemp,* where the court describes the prosecutor's closing argument:

> We need hardly belabor the point that this incorrect report of Supreme Court prece-

---

6. A brief history lesson is in order. It must be remembered that under the Constitution of Indiana there is an old Jacksonian concept that a jury in a criminal case is the judge of both the law and facts. "In all criminal cases whatever, the jury shall that the right to determine the law and the facts." Ind. Const. Art. I § 19. For well over a century, juries in criminal cases in Indiana have been so instructed. For further enlightenment on this *See,* John Bodle, *Criminal Law—Indiana Juries in Criminal Cases as Judges of Law Under Constitutional Relic,* 24 Notre Dame L.Rev. 365, (1948–49); *Beavers v. State,* 236 Ind. 549, 141 N.E.2d 118 (1957); *Drake v. State,* 272 Ind. 302, 397 N.E.2d 600 (1979); *Abercrombie v. State,* 478 N.E.2d 1236 (1985).

dent is highly prejudicial to a capital defendant. While the Supreme Court has decided that a state's decision to implement a capital punishment scheme does not violate the ... Constitution [citing *Gregg*], the Court has not been called upon to endorse capital punishment. The prosecutor's selective quotation from *Gregg* told the jury not only that the Supreme Court endorsed capital punishment, but also that the Supreme Court views capital punishment as essential in an ordered society. This placed the weight of opinion from the nation's highest judicial officers on the side of imposing the death penalty.

*Id.* at 627.

This court finds the Eleventh Circuit opinion in *Wilson v. Kemp* inapposite. In *Wilson,* the prosecutor's misuse of the *Gregg* opinion in the closing argument is *only part* of the reason the Eleventh Circuit granted the writ of habeas corpus. Perhaps, the more important reason to the *Wilson* court was the fact that in addition to reading from *Gregg,* "the prosecutor read a passage from a 19th Century Georgia case." *Id.* The passage ends with this sentence: "A stern, unbending, unflinching administration of the penal laws, as it is the highest mark of civilization, is also the surest mode to prevent the commission of offenses." *Id.* quoting *Eberhart v. State,* 47 Ga. 598, 609–610 (1873). Not only has the Supreme Court of Georgia "condemned [the] use of this passage by prosecutors," the Eleventh Circuit has also considered the propriety of using the quotation from *Eberhart* in a closing argument and has deemed it "extremely improper." *Id.* (citations omitted).

After explaining the continued and unswerving impropriety of utilizing the quotation from *Eberhart,* the *Wilson* court discussed the prosecutor's use of the *Gregg* decision. The prosecutor in *Wilson* invoked the *Gregg* decision in a far more egregious fashion than the prosecutor here.[7] More importantly, it was the combination of the quotations from a known pariah and the misuse of the *Gregg* quotation that led the *Wilson* court to explain:

We need not address the effect of either argument alone. However, the combined effect of the *Eberhart* quote and the *Gregg* quote is highly prejudicial. On the one hand, the jury was told that the basic rationale for a sentence of life imprisonment—i.e., mercy—was an invalid consideration to inform their decision. On the other hand, the jury was told that its other choice—i.e., the death penalty—had been endorsed by this nation's highest court as "essential in an ordered society." These two improper and highly prejudicial arguments by the prosecutor undermine our confidence in the result that was reached by the jury in the sentencing phase of Wilson's trial. The improper argument was "so egregious as to create a reasonable probability that the outcome was changed."

*Wilson,* 777 F.2d at 627.

▇▇▇ Next, the petitioner asserts that the prosecutor's "description of the legislative choice to adopt the death penalty and his own decision to pursue capital charges" undermined the reliability of the death sentence. *Traverse Memorandum,* at 61. Specifically, the petitioner includes the following excerpt from the prosecutor's closing:

I think if you keep that in mind, how we got here, who it was that decided we would be here today, to determine the sentence. And what the law is, then you can understand the role in this stage of the trial. And you couple that with the fact that you make a recommendation to the judge. He can accept the recommendation, or reject the recommendation, regardless of whether you recommend the death penalty or not.

*Id.* This statement is exacerbated, according to the petitioner, insofar as "[t]hroughout the

---

7. The *Wilson* court explained:

> As used by the prosecutor, the Gregg passage conveys the impression that "this function"—i.e., capital punishment—is "essential in an ordered society." By contrast, the Supreme Court's intended meaning was quite different, as shown by a reading of the entire Gregg passage in context. The intended meaning was that recognition of the function of retribution is "essential in an ordered society."
> *Id.*

voir dire examination of prospective jurors both judge and prosecutor stressed the point that the jury's role in the death sentence decision was merely to recommend and that the judge would bear the ultimate responsibility." *Id.*

The petitioner argues that these remarks are similar to those found in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), to have undermined the reliability of a death sentence because "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Traverse Memorandum*, at 61.

In reviewing the petitioner's sentencing phase arguments, the Indiana Supreme Court explained:

> Finally, Smith asserts the State's argument during the sentencing phase of trial deprived Smith of a fair hearing. The challenged arguments concern the purpose of the death penalty, the need to impose the death penalty on the aggravating circumstance of killing a police officer, and the return of the defendants to the streets if the jury accepted their self-defense theory. Smith claims these were inflammatory and constituted appeals to anger and fear. The prosecutor's argument was devoted to showing the evidence of guilt was overwhelming. The prosecutor was not calling for a verdict premised on impermissible factors, but for one premised on the jury's belief in the evidence. Defense counsel discussed the propriety of the death penalty, and its suitability as the penalty for the murder of Ohrberg. The State merely responded with a counter-argument on the philosophical reasons for the death penalty in cases such as this. The remarks referring to the jury doing its duty did not mean that the jury was compelled to convict or to recommend the death penalty because of the death of the police officer. The remark meant the jury's duty was clear if, as the State contended, the charges had been proven.

*Smith II*, 516 N.E.2d at 1064.

In *Dugger v. Adams*, 489 U.S. 401, 409, 109 S.Ct. 1211, 1217, 103 L.Ed.2d 435 (1989), the Supreme Court considered a *Caldwell* claim in light of Florida state law. On this issue, the Court explained that "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Id.* at 406, 109 S.Ct. at 1215. The *Dugger* Court explained that if the petitioner had the grounds for a *Caldwell* challenge because the prosecutor misinformed the jury of its role in sentencing, then at the state level the petitioner "plainly [had] the basis for an objection and an argument on appeal that the instruction violated state law." *Id.* The petitioner in *Dugger* failed on both counts. The petitioner failed to object or appeal at the state level and then included the claim in the § 2254 petition. The Court explained that any resolution of the *Caldwell* claim required an evaluation of procedural default. The Court, speaking through Justice White, explained:

> [T]he ground for challenging the trial judge's instruction—that they were objectionable under state law—was a necessary element of the subsequently available *Caldwell* claim. In such a case, the subsequently available federal claim does not excuse the procedural default.

*Id.* at 410, 109 S.Ct. at 1217 (footnote omitted).

More importantly, and dispositive to this claim, is the recent Supreme Court decision in *Sawyer v. Smith*, 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990). In a 5–4 decision, the Supreme Court, speaking through Justice Kennedy, indicated that a claim based on *Caldwell* states a "new rule" under the *Teague v. Lane* analysis. Specifically, the *Sawyer* Court explained:

> We must address first whether, in relying on *Caldwell*, petitioner claims the benefit of a new rule, as defined by our decision in *Teague*. In *Caldwell*, we held that the Eighth Amendment prohibits the imposition of a death sentence by a sentencer that has been led to the false belief that the responsibility for determining the appropriateness of the defendant's capital sentence rests elsewhere. We determined that false information of this type might

produce "substantial unreliability as well as bias in favor of death sentences."

\*   \*   \*   \*   \*   \*

Our review of the relevant precedents that preceded *Caldwell* convinces us that it is a new rule for purposes of *Teague.* The rule of *Teague* serves to "validate reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler v. McKellar,* [494 U.S. 407, 414] 110 S.Ct. 1212, 1217 [108 L.Ed.2d 347] (1990). Thus, we have defined new rules as those that were not "dictated by precedent existing at the time the defendant's conviction became final." *Teague, supra,* 489 U.S., at 301, 109 S.Ct. at 1087. The principle announced in *Teague* serves to ensure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered. This is but a recognition that the purpose of federal habeas corpus is to ensure that state convictions comply with the federal law in existence at the time the conviction became final, and not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrine.

*Sawyer,* 497 U.S. at 233–34, 110 S.Ct. at 2826–27. Here, as in *Sawyer v. Smith,* the petitioner's claim can not supplant the bar of *Teague.*

■ The petitioner contends that the jury instruction in the sentencing phase of the trial did not adequately inform the jury of the need to find beyond a reasonable doubt that [the petitioner] knew the victim was a police officer. On this issue, the petitioner explains that "the Indiana Supreme Court acknowledged that only one jury instruction purported to inform the jury that it was necessary to find that [the petitioner] knew the victim was a law enforcement officer." *Traverse Memorandum,* at 72.

In reviewing this claim in the first post-conviction appeal, the Indiana Supreme Court observed that the jury instruction stated:

[U]nder the information, the State must prove to you beyond a reasonable doubt that the victim of the murder, Jack R. Ohrberg, was a law enforcement officer, and that the victim was acting in the course of his duty, and that the defendant knew the victim was a law enforcement officer.

*Smith II,* 516 N.E.2d at 1065.

This whole trial both the guilt phase and the sentencing phase *were about the murder of a law enforcement officer.* The instructions and verdict forms must be evaluated as a whole to determine whether they pass constitutional muster. *See California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). Here, the instructions were proper and the jury considered the instructions in due course in reaching this verdict. This verdict is constitutionally sound. It seems beyond dispute that this verdict is sound insofar as "[a] judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

The petitioner makes several claims on the machinations of the Indiana death penalty statute. These claims must be viewed in light of Indiana law. A trial judge determines a defendant's sentence after the jury issues its sentencing recommendation. *Indiana Code* § 35–50–2–9 (Burns 1979) states that "the court shall make the final determination of the sentence, after considering the jury's recommendation." *Id.* The Indiana Code further states that "the court is not bound by the jury's recommendation." *Id.*

■ The petitioner contends that the record fails to contain the statutorily required finding that, beyond a reasonable doubt, the petitioner knew the victim was a police officer at the time of the fatal shooting. On this issue, the petitioner indicates that the trial court's written findings are inadequate because the court "ignores two undisputable facts: (1) The Indiana Supreme Court requires written findings of fact by the trial judge and such written findings are the only

permissible record for appellate review of a death sentence. (2) The trial judge did not include in his written findings of fact any determination that [the petitioner] knew the victim was a police officer at the time of the shooting." *Traverse Memorandum*, at 69. The petitioner makes this assertion based on the trial judge's statement: "I further find that you knowingly directed this fire and this death-causing instrument to Sergeant Ohrberg while he was in the course of his duties as a police officer." *Id.* at 70.

The relationship between the judge and jury for purpose of the death penalty in Indiana was discussed in *Schiro v. Clark,* 963 F.2d 962 (7th Cir.1992) (*cert. granted,* —— U.S. ——, 113 S.Ct. 2330, 124 L.Ed.2d 243 (1993)). In *Schiro,* the petitioner argued "that the Indiana Death Penalty statute violates constitutional guarantees provided by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution." *Id.* In evaluating this claim, the *Schiro* court explained:

> The constitutional challenge raised by petitioner would indeed be a significant one If the Supreme Court had not largely resolved the matter in *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 [(1984)]. In *Spaziano,* the Court held that a judge may impose the death penalty despite a jury's recommendation to the contrary, since defendants have no constitutional right to jury sentencing in capital cases. Subsequent Supreme Court decisions have confirmed that holding. "The decision whether a particular punishment—even the death penalty— is appropriate in any given case is not one that we have ever required to be made by a jury." *Clemons v. Mississippi,* 494 U.S. 738, 745–746, 110 S.Ct. 1441, 1446–1447, 108 L.Ed.2d 725 [(1990)] (quoting *Cabana v. Bullock,* 474 U.S. 376, 385, 106 S.Ct. 689, 696, 88 L.Ed.2d 704 [(1986)]).

> \*　　\*　　\*　　\*　　\*　　\*

> Under *Spaziano,* a reviewing court's responsibility "is not to second-guess the deference accorded to the jury's recommendation in a particular case, but to ensure that the result of the process is not arbitrary or discriminatory." *Id.* 468 U.S. at 465 [104

S.Ct. at 3165]. *See also Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 [(1972)]. Review designed to invalidate arbitrary or discriminatory sentences not only provides a more direct link to values of fairness and consistency, but also provides a more judicially manageable standard than reviewing the level of judicial deference accorded to the jury. Short of mind-reading or the submission of evidence regarding a sentencing judge's thought processes, this Court knows of no way to distinguish a case in which a trial judge gave serious consideration to the jury's sentencing recommendation before rejecting it, from a case in which the trial judge did not give serious consideration to the jury's recommendation before rejecting it. In short we cannot discern a practicable standard for reviewing the amount of deference the trial judge accorded to the jury's recommendation.

This Court, of course, seeks to ensure that the application of the death penalty statute is neither arbitrary nor discriminatory. *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 [(1980)], sets forth three criteria to determine whether a state has appropriately limited a sentencer's discretion. The statutory scheme must furnish clear and objective standards, specific and detailed guidance, and an opportunity for rational review of the process for imposing the death sentence. *Id.* at 427, 100 S.Ct. at 1764 (Stewart, J., plurality opinion); *Stringer v. Black,* 494 U.S. 1074, 110 S.Ct. 1800, 108 L.Ed.2d 931 [(1990)] (No. 90–6616) (March 9, 1992) (explicitly applying the *Godfrey* principle to a "weighing" state). Furthermore, a sentencing scheme must narrow the class of persons eligible for the death penalty. *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 [(1988)]. Indiana's list of aggravating and mitigating factors provides fixed, objective and uniform discretionary constraints to guide death penalty sentencing decisions. Although Indiana vests sentencing authority in a judge rather than a jury, the judge's discretion is limited by the same factors which limit the jury's sentencing

discretion. **Before a judge can impose the death sentence she must find the existence of one of nine aggravating circumstances beyond a reasonable doubt.** *Ind.Code* § 35–50–2–9 (Burns 1979). In addition, the trial judge must find that any aggravating factors outweigh any mitigating factors. *Id.* Not only has Indiana enumerated clear, objective and specific standards for imposing the death penalty, but it has also required the sentencing judge to make written findings with respect to those factors in order to facilitate appellate review. *Ind.Code* § 35–4.1–4–3 (Burns 1979). As a result of these safeguards, the Indiana death penalty statute will not lead to arbitrary or discriminatory results generally or in Schiro's case. There is no one set way for a state to set up its capital sentencing scheme. *Spaziano,* 468 U.S. at 464 [104 S.Ct. at 3164]. *Id.* at 968–69.

As the Seventh Circuit explained in *Schiro,* "[b]efore a judge can impose the death sentence she must find the existence of one of nine aggravating circumstances beyond a reasonable doubt." *Id.* It is clear that the state trial judge made this determination on this issue.

█ Along these same lines, the petitioner tackles this same issue from a different angle. The petitioner alleges that the Indiana death penalty was unconstitutionally applied to the petitioner because of the failure to make proper findings as to the required aggravated circumstances. Specifically, the petitioner maintains that the aggravating circumstance of murder of a police officer in the course of duty has not been established. On this issue, the petitioner contends based on I.C. § 35–50–2–9(b)(6)(A) that the victim police officer must be "acting in the course of duty" in order to qualify for the death penalty. The petitioner relies on *Spranger v. State,* 498 N.E.2d 931, 942–43 (Ind.1986), *cert. denied,* 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1987). In so doing, the petitioner maintains that the Indiana Supreme Court in *Smith II* misrepresented *Spranger, supra,* "by asserting that the court 'upheld a death sentence for the murder of a police officer acting in the course

of his duty when he attempted to effect an arrest outside the geographical limits for his arrest jurisdiction.'" *Traverse Memorandum,* at 64. The petitioner then maintains that Ohrberg was not acting in the course of his duty because he failed to following the specific details of a knock and announce statute in IC § 35–33–2–3(b). This proposition rests on the fact that "the police witnesses testified that Ohrberg announced only the word 'police' as he knocked on [the petitioner's] door." *Id.* at 66. According to the petitioner, Ohrberg revealed neither "his specific identity" nor "his purpose for demanding a response in the hours of darkness as required by statutory (and probably constitutional) mandate." *Id.*

To suggest that this criminal conviction which has passed constitutional muster by the Indiana Supreme Court three times should be reconsidered here under 28 U.S.C. § 2254 because of a dispute over a knock and announce statute is completely without merit. The Indiana Supreme Court indicated that the police officer was acting in the course of his duties as a police officer. Such a conclusion likely ends this issue insofar as this issue fails to state an issue under the U.S. Constitution and is rather an issue of state law. *See Estelle v. McGuire, supra.*

An argument very similar to that made here was at issue in *Williams v. Chrans,* 945 F.2d 926 (7th Cir.1991). In *Williams,* on an appeal from the petitioner's state capital murder trial, the Illinois Supreme Court decided an issue *inter alia* pertaining to a state law issue. The petitioner argued that the decision rendered by the Illinois Supreme Court in his appeal was not supportable in light of another case issued by the Illinois Supreme Court on the same issue. Much like the petitioner here argues that Ohlberg was not acting in the course of his duties. The *Williams* court explained that "Illinois law, . . . as interpreted by the Illinois Supreme Court, permitted the jury to conclude that [the petitioner] committed the ['charged capital murder crime.]'" *Id.* at 956. More importantly, the *Williams* court, speaking through Judge Ripple, explained:

A habeas petitioner cannot challenge a state court's construction of state law. "If

the state law, as construed by the state's tribunal, provided an unconstitutional result, then the writ should be granted, but not on the ground the state doesn't know its own law." *United States ex rel. Bracey v. Fairman,* 712 F.2d 315, 317 (7th Cir. 1983). Therefore, we review a state's determination of aggravating factors only to examine whether they "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); see also *Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980) (must be principled way to distinguish between those cases in which death penalty imposed and those cases it was not); *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White J., concurring) (same).

*Id.* at 956. This court concurs with the Seventh Circuit on this issue, and finds that this argument is not cognizable under 28 U.S.C. § 2254.

## E. Aggravating Circumstances

■■■ The petitioner argues that the trial court relied on improper non-statutory aggravating circumstances without notice to the petitioner. On this issue, the petitioner also contends that "in imposing the death penalty, [the trial judge] relied on non-statutory aggravating circumstances, without any notice to [the petitioner] that he would rely on them." *Petitioner's Memorandum in Support of Amended Petition for Writ of Habeas Corpus,* p. 5 (filed July 1, 1994) (hereinafter "July 1," Memorandum). The non-statutory aggravators used, according to the petitioner, were:

—that Smith's conduct caused and threatened to cause serious bodily harm to other people;

—that Smith contemplated his act by the knowing use and collection of especially deadly weapons;

—that there was no provocation whatsoever for his acts;

—that no grounds existed to excuse his conduct at that time;

—that he played a major role in the commission of the offense;

—that he made no good faith effort whatsoever to compensate or explain his actions to the victim in this case, including "every law abiding citizen in this State who are also victims;"

—a failure by Smith to comply with the ordinary standards that the law requires;

—that Smith's conduct indicates that he was motivated by something that the law will not allow;

—that Smith's past record indicates that he had been given the opportunity to rehabilitate himself and was unwilling to attempt to rehabilitate himself;

—that Smith had been given opportunity after opportunity to conform his conduct to the minimal requirements that society requires, which is the expression of the law.

*Id.* at 5–6.

The Indiana Supreme Court had already addressed the above mentioned aggravating factors in *Smith I:*

The trial judge then found that the felony committed by defendant Smith resulted in the death of Sgt. Ohrberg and involved the threat of death and great bodily harm to other people. He found that Defendant knowingly directed gunfire toward Sgt. Ohrberg while he was in the performance of his duties as a police officer. He found this conduct caused and threatened to cause serious bodily harm to other people. He then found from considering all the circumstances in the case that Defendant contemplated this act by the knowing use and collection of especially deadly weapons. He found there was no provocation whatsoever for Defendant's acts and no grounds existed that he could find in the cause to excuse the conduct intentionally engaged in by Defendant on the night of the murder. The judge then found that Defendant played a major role in the commission of this offense and that he made no good faith effort whatsoever to compensate or explain his actions to the victim in this case. He further found that the age of the

defendant was not a factor in the case. The trial judge then concluded that the proper sentence for Smith was death by electrocution.

*Smith I,* 465 N.E.2d at 1126.

On this issue, the petitioner argues that "the court's reliance on non-statutory aggravating factors" is unconstitutional because "I.C. 35–50–2–9 limits consideration to only the aggravating factor relied upon by the State [and the petitioner] did not have advance notice that the court would rely on any aggravating circumstances other that those enumerated in the statute." *July 1 Memorandum,* at 6. The Indiana Supreme Court clearly has a different view of this issue as the consideration of these factors were specifically referenced by the Court.

In constructing this argument, the petitioner cites to *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). In *Gardner,* the jury "found that the mitigating circumstances outweighed the aggravating circumstances and advised the court to impose a life sentence." *Id.* at 352–353, 97 S.Ct. at 1202. While the jury was deliberating the sentence, the judge indicated that "he was going to order a presentence investigation of [the] petitioner." *Id.* After the jury returned this verdict, the "trial judge entered findings of fact and a judgment sentencing petitioner to death." *Id.* This finding was based on the fact that the felony " 'especially heinous, atrocious or cruel; and that such aggravating circumstances outweighs the mitigating circumstance, to-wit: none' " *Id.* (citation omitted). "As a preface to that ultimate finding, he recited that his conclusion was based on the evidence presented at both stages of the bifurcated proceeding, the arguments of counsel, and his review of *'the factual information contained in said presentence investigation." Id.* (emphasis added). The presentence investigation report "contained a confidential portion which was not disclosed to defense counsel." *Id.*

Among several arguments in defense of the proceedings, the state of Florida "argues that trial judges can be trusted to exercise their discretion in a responsible manner, even though they may base their decisions on secret information." *Id.* On this issue, the Court, speaking through Justice Stewart, explained that "[w]ithout full disclosure" of the basis for the death sentence, the Florida capital-sentencing procedure would be subject to the defects which resulted in the holding of unconstitutionality in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

This court finds that the issue in *Gardner v. Florida* does not advance the petitioner's argument here. There was no clandestine consideration of evidence. More importantly, the Indiana statutes do contain language of an open-ended nature that such could include the factors addressed by Judge Boles. More importantly, this court finds that this matter is similar to the issue discussed in *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). In *Barclay,* the petitioner "contend[ed] that his sentence must be vacated because the trial judge, in explaining his sentencing decision, discussed the racial motive for the murder and compared it with his own experiences in the Army in World War II, when he saw Nazi concentration camps and their victims." *Id.* at 948, 103 S.Ct. at 3424. The petitioner argued that "the trial judge improperly added a nonstatutory aggravating circumstance of racial hatred and should not have considered his own experiences." *Id.* In rejecting this argument, the *Barclay* Court, speaking through then Justice, now Chief Justice Rehnquist, explained:

> The United States Constitution does not prohibit a trial judge from taking into account the elements of racial hatred in this murder. The judge in this case found Barclay's desire to start a race war relevant to several statutory aggravating factors. The judge's discussion is neither irrational nor arbitrary. In particular, the comparison between this case and the Nazi concentration camps does not offend the United States Constitution. Such a comparison is not an inappropriate way of weighing the "especially heinous, atrocious, or cruel" statutory aggravating circumstance in an attempt to determine whether it warrants imposition of the death penalty.

Any sentencing decision calls for the exercise of judgment. It is neither possible nor desirable for a person to whom the State entrusts an important judgment to decide in a vacuum, as if he had no experiences. The thrust of our decisions on capital punishment has been that " 'discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' " *Zant v. Stephens,* 462 U.S. 862, 874 [103 S.Ct. 2733, 2741, 77 L.Ed.2d 235] (1983), quoting *Gregg v. Georgia,* 428 U.S. 153, 189 [96 S.Ct. 2909, 2932, 49 L.Ed.2d 859] (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). This very day we said in another capital case:

> "In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar 'central issue' from which the jury's attention may be diverted. Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, as did respondent's jury in determining the truth of the alleged special circumstance, the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." (Citations Omitted).

We have never suggested that the United States Constitution requires that the sentencing process should be transformed into a rigid and mechanical parsing of statutory aggravating factors. But to attempt to separate the sentencer's decision from his experiences would inevitably do precisely that. It is entirely fitting for the moral, factual, and legal judgment of judges and juries to play a meaningful role in sentencing. We expect that sentencers will exercise their discretion in their own way and to the best of their ability. As long as that discretion is guided in a constitutionally adequate way, *see Proffitt v. Florida,* 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913] (1976), and as long as the decision is not so wholly arbitrary as to offend the Constitution, the Eighth Amendment cannot and should not demand more.

*Id.* 463 U.S. at 949–51, 103 S.Ct. at 3424–25. *See also, Silagy v. Peters,* 905 F.2d 986 (7th Cir.1990). In evaluating this process, this court notes the Seventh Circuit's language in *Schiro, supra*—"the trial judge must find that any aggravating factors outweigh any mitigating factors." *See Schiro, supra.*

■■■ The petitioner maintains that "he did not receive individualized consideration when the death penalty was imposed." *Traverse Memorandum.* The findings, both those orally announced and the written "Findings of the Court in Imposing Penalty of Death as to Tommie J. Smith" demonstrate that the petitioner received individual consideration by the trial judge. There were separate direct appeals with separate counsel. The Indiana Supreme Court gave detailed and individualized consideration to the petitioner. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983). "That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Tuilaepa v. California,* —— U.S. ——, ——, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994).

On this issue, the Indiana Supreme Court explained that the trial judge considered the requisite mitigating factors:

> The trial judge made detailed and written findings pursuant to Ind.Code § 35–50–2–9 (Burns Supp.1984) to facilitate our review. The trial judge found that the State had proven beyond a reasonable doubt the aggravating circumstance that the victim of this murder was a law enforcement officer acting in the course of his duty. *He then indicated it was his duty to determine any mitigating circumstance in the case.* He then specifically considered each mitigating circumstance set out in the above statute. He indicated he was doing this from reviewing all the evidence in the case, the arguments of counsel, the law as presented to him by counsel, and the pre-sentence

investigation as submitted to the court by the probation department. He found that Defendant had a significant history of prior criminal conduct and detailed these involvements in his findings, concluding that mitigation was not proven in that regard. He found there was no evidence of mitigating circumstance with regard to the question of whether defendant Smith might have been under the influence of extreme mental or emotional disturbance when he committed this murder by finding that there was no evidence in the record whatsoever that Defendant was, in fact, under any mental or emotional disturbance at the time of the crime. He further found beyond a reasonable doubt that there was no indication whatsoever that the victim in this case participated in or consented to Smith's conduct against him. He further considered the mitigating circumstance of whether or not the murder was committed by another person and the participation of this defendant was relatively minor. The judge then found that by the words of the defendant himself, he indicated that his participation was direct. He further found that he searched the record to determine whether or not defendant Smith had acted under the substantial domination of another person and found beyond a reasonable doubt that there was no such domination by anyone else but that this was a conscious act by defendant Smith that he chose. He then directly found that there was no evidence to indicate that he defendant did not appreciate the criminality of his conduct or conform his conduct to the requirements of law because of being substantially impaired by mental disease or defect or intoxication. He found there were no facts whatsoever presented to indicate this. The trial judge therefore found that there were no mitigating circumstances.

*Smith I,* 465 N.E.2d at 1125–26. There is no constitutional infraction here.

### F. Evidentiary Hearings

On July 5, 1994, the petitioner filed a Motion for an Evidentiary Hearing. The petitioner is requesting an evidentiary hearing on the "false evidence concerning the source of the victim's back wounds" and the "ineffective assistance of counsel at pre-trial, trial, and the sentencing stages of the state court proceedings." *See Motion for Evidentiary Hearing.* The Attorney General argues that the petitioner has failed to show that he is entitled to an evidentiary hearing. *This court finds no basis for an evidentiary hearing, and therefore, the motion is denied. Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).

### 1. FALSE TESTIMONY

■ On this issue of so-called "false testimony," this court finds that this issue entails state court factual findings made in the course of deciding various constitutional issues and those facts are subject to the presumption of correctness standard of 28 U.S.C. § 2254(d). The statute provides that "a determination after a hearing on the merits of a factual issue, made by a state court of competent jurisdiction ... shall be presumed to be correct" unless "the merits of the factual dispute were not resolved in the state court hearing." *Galowski v. Murphy,* 891 F.2d 629, 635 (7th Cir.1989), *cert. denied,* 495 U.S. 921, 110 S.Ct. 1953, 109 L.Ed.2d 315 (1990). Therefore, under section 2254(d), the court must defer to the state court's findings regarding the underlying facts of who did what to whom, when, where, and why. *Weidner v. Thieret,* 866 F.2d 958, 961 (7th Cir.1989).

This court finds that the facts as found by the state court on this issue are correct. The Indiana Supreme Court discussed this issue and stated that the false testimony claim was "merely an interpretation of selected evidence in the light most favorable to [the petitioner.]" *Smith II,* 516 N.E.2d at 1061. The police officers were in the dark, under fire, and had just witnessed another officer take several bullets. This court will *not* hold an evidentiary hearing on this issue.

### 2. EFFECTIVENESS OF COUNSEL

■ The petitioner also seeks an evidentiary hearing on the Sixth Amendment right to effective assistance of counsel. Here, the petitioner is attempting to wire around procedural default. The petitioner pursued ar-

guments under the Sixth Amendment on direct appeal. In the first post-conviction action, the petitioner pursued several more Sixth Amendment claims. The claims were different than those of the direct appeal. In each of the post-conviction appeals, the Indiana Supreme Court found that the claims were barred by waiver. *See, Smith II, supra* at 1059; *Smith III, supra* at 414. This court has given special attention to the findings and conclusions made by Judge Gifford on September 29, 1986. (State Trial Record at 260–268). These were made *after* an evidentiary hearing in which this petitioner was represented by his present counsel. The same found favor with all Justices on the Supreme Court of Indiana. (*See,* 516 N.E.2d 1055 (1987). For purposes of reference Judge Gifford's Findings of Fact and Conclusions of law are hereto attached as Appendix A. These factual conclusions are entitled to a presumption of correctness under 28 U.S.C. 2254(d).

The petitioner is barred by procedural default from pursuing any of the Sixth Amendment arguments except for those outlined in the direct appeal. The Indiana Supreme Court was clear on the fact that the petitioner has waived this issue. In *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989), the Court explained that a "procedural default does not bar consideration of a federal claim on either direct or habeas review unless *the last state court* rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Id.* (internal quotation omitted). The rule in *Harris v. Reed, supra,* was altered by the Supreme Court in *Coleman v. Thompson,* 501 U.S. 722, 725–31, 111 S.Ct. 2546, 2552–54, 115 L.Ed.2d 640 (1991). On this issue, the *Coleman* Court indicated that "[i]n habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, *and* did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition." *Id.* In addition, the *Coleman* Court explained:

In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns for comity and federalism. Without the rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

*Id.* Therefore, it is clear that a state court holding on a state court procedural rule restricts federal court habeas review if the state court explanation comports with the above mentioned caselaw.

■■■ The petitioner argues that this court should hold an evidentiary hearing on the Sixth Amendment claims and on the claim that the accuracy of the State's evidence concerning the source of the victim's wounds. This court finds that it is not necessary to hold an evidentiary hearing and expand the record to acquire further facts. In *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the Supreme Court enunciated the procedures for administering the formalities of an evidentiary hearing:

Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.

*Id.* at 312–13, 83 S.Ct. at 757. In *Townsend,* the Supreme Court enumerated the six conditions necessitating an evidentiary hearing:

If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hear-

ing or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id.* at 313, 83 S.Ct. at 757. *See also* 28 U.S.C. § 2254(d).

■ In 1992, the Supreme Court in *Keeney v. Tamayo–Reyes, supra,* altered these rules governing evidentiary hearing and assigned to this process a more stringent standard. In *Keeney,* the Supreme Court held that the cause-and-prejudice standard is the appropriate measure for excusing a habeas petitioner's failure to develop a material fact in state-court proceedings. *See Keeney,* 504 U.S. at ——, 112 S.Ct. at 1718. The Court declared, "application of the cause-and-prejudice standard ... will appropriately accommodate concerns of finality, comity, judicial economy, and channeling the resolution of claims into the most appropriate forum." *Id.* at ——, 112 S.Ct. at 1719. Therefore, the habeas petitioner is entitled to an evidentiary hearing if he can show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure. *Id.* at ——, 112 S.Ct. at 1720.

The petitioner is arguing ineffective assistance of counsel was the cause and that counsel errors resulted in prejudice. *See also Gomez v. Ahitow,* 29 F.3d 1128 (7th Cir.1994); *Hockett v. Duckworth,* 999 F.2d 1160 (7th Cir.1993). Here, the issue of prejudice from any Sixth Amendment argument merges with the prejudice requisite to procedural default. *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Here, the petitioner's claim must fail under the second prong of the test-prejudice. The second part of the test is dispositive in light of the reformulation recently crafted by the Supreme Court in *Lockhart v. Fretwell,* —— U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). In order to assert a viable Sixth Amendment claim, not only must the petitioner satisfy the first part of the test enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the petitioner must also illustrate how the error prejudiced the result of the trial. This is a difficult task. Recently, the Supreme Court restructured the second part of the

*Strickland* test in *Lockhart v. Fretwell, supra,:*

> Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Id.* —— U.S. at —— ——, 113 S.Ct. at 842–43. In reevaluating the analysis under the *Strickland* test, the Court posited a slightly more restrictive test:

> It focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him.

*Id.* at ——, 113 S.Ct. at 844. This court finds that the trial *was reliable and the proceedings were fair.* This court finds that the petitioner can not satisfy this stringent test because the evidence of the petitioner's guilt is overwhelming. Nor has the petitioner shown a fundamental miscarriage of justice—such a claim involves the notion of innocence. There is no fundamental miscarriage of justice here. *See Milone v. Camp,* 22 F.3d 693 (7th Cir.1994). The Supreme Court of Indiana specifically addressed the alleged ineffectiveness of appellate counsel Wolfe:

> Smith claims the 796 page brief riled on direct appeal is *prima facie* sufficient to overcome the presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Smith attacks the length of his appellate brief, the large number of issues raised, and the election of Wolfe to summarize each witness's testimony in the Statement of Facts. The criticisms raised are stylistic questions with no demonstration harm to Smith as a result. As the brief sufficiently enabled this Court to reach the issues, it will not support this claim of ineffective assistance. *See, Ingram v. State,* 508 N.E.2d [805] at 808 [ (Ind.1987) ]. Smith does not demon-

strate any issues to be raised on an appeal *de novo* that are omitted from the current brief, and which, as a result, cannot be determined in this post-conviction appeal. Smith has not shown a failure of his appellate counsel to perform within the wide norms of reasonable professional conduct, and has shown no prejudice.

*Smith II,* 516 N.E.2d at 1059–60.

The same appellate court before which appellate counsel appeared thus failed to find that a violation of the requirements found in *Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) was present in this record. In this regard *Mayo v. Henderson,* 13 F.3d 528 (2nd Cir.1994) (*cert. denied,* —— U.S. ——, 115 S.Ct. 81, 130 L.Ed.2d 35 (1994), is of no help to this petitioner. This issue there was the alleged violation of a New York state case, *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881, (*cert. denied* 368 U.S. 866, 82 S.Ct. 117, 7 L.Ed.2d 64 (1961). *Rosario* and that New York statute embodying it, N.Y.Crim.Pro. L.Sect. 240.45(1)(a) are state law cousins to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *U.S. v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) and are of no specific moment here.

This court has here attempted to do precisely what Judge Flaum and panel required in *Gray v. Greer,* 800 F.2d 644 (7th Cir.1985).

and that did not, repeat not, *demand* an evidentiary hearing.

## III.  CONCLUSION

The petitioner filed a Motion to Amend the Petition for Writ of Habeas Corpus on June 28, 1994. In support of that June 28, 1994 motion, petitioner submitted a Memorandum of Points and Authorities in Support of Amended Petition for Writ of Habeas Corpus on July 1, 1994 and another on October 14, 1994. *Such Motion to Amend is now formally denied.* Here, after the first post-conviction hearing, the Indiana Supreme Court explained that many issues outlined by the petitioner in his brief has been waived. Most recently, the Indiana Supreme Court, after the second post-conviction hearing, issued a four page opinion on this very same issue. This court can not address an issue if the last state court, here—the Indiana Supreme Court has held that an issue is waived unless the petitioner can supplant this bar with an argument on cause and prejudice or a miscarriage of justice. This has not been done.[8] Therefore, this motion to Amend is DENIED.

"One simple fact exists in this case: [the petitioner] was convicted of crimes for which the Constitution and [Indiana] law permit the imposition of the death penalty." *Davis v. Greer,* 13 F.3d 1134, 1144 (7th Cir.1994). The jury heard the evidence at both the guilt

---

8. Insofar as *Harris, supra,* dictates that a state court procedural rule restricts federal court habeas review, the converse is also true. If the state court eschews a state procedural bar and addresses a viable habeas claim, then clearly, a federal court can reach the merits of the claim as well. The Supreme Court in *Ylst v. Nunnemaker,* 501 U.S. 797, 800, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991) explained that "[s]tate procedural bars are not immortal ... they may expire because of later actions by state courts." *Id.* "If the last state court to be presented with a particular federal claim reaches the merits even though the particular claim may have been procedurally barred, then it removes any bar to federal court review that might otherwise have been available." *Id.* Therefore, even though a procedural rule may be of fundamental importance, a federal district court can not invoke that rule as a bar to federal habeas relief when the state court faced with the same rule reached the merits of the petitioner's claim.

For example, in *Church v. Sullivan,* 942 F.2d 1501 (10th Cir.1991), the Tenth Circuit explained that "[i]n applying *Harris v. Reed* here, the magistrate looked not to the New Mexico habeas court decision, but to the earlier state court of appeals decision on direct review." *Id.* "Although the state habeas court had reached the merits of Church's claims without addressing or raising a procedural default question, the federal magistrate discounted that court's opinion because of his view that the state habeas court 'did not have jurisdiction to decide those issues' due to waiver by [the petitioner] of the claims...." *Id.* at 1506. (citations omitted). In light of *Ylst, Harris,* and *Coleman v. Thompson,* the *Church* court explained that "[federal courts] must focus on the last state court decision explaining its resolution of [a petitioner's federal claims]...." *Id.* Therefore, the *Church* court explained that in light of the last state court opinion reaching the merits, the federal district court, or in this case, the Magistrate Judge could have and should have reached the merits.

phase and the penalty phase, and concluded that the petitioner's "actions warranted the death penalty." *Id.* "That decision is within their discretion, was neither arbitrary nor capricious, and did not violate the Constitution." *Id.*

The state of Indiana complied with the Constitution of the United States when it sentenced Tommie Smith to death. Therefore, this court finds no basis for granting this writ of habeas corpus under § 2254. The petition is DENIED.

**IT IS SO ORDERED.**